**DYNCORP, Plaintiff,**

v.

**GTE CORPORATION, Defendant.**

**No. 01 Civ. 7445(AKH).**

United States District Court,
S.D. New York.

July 17, 2002.

William J. McSherry, Jr., Daniel C. Savitt, Arent, Fox, Kintner, Plotkin & Kahn, PLLC, New York City, for Plaintiff.

## OPINION AND ORDER PARTIALLY GRANTING MOTION TO DISMISS AND GRANTING LEAVE TO AMEND

HELLERSTEIN, District Judge.

Plaintiff DynCorp filed this suit against defendant GTE Corporation, claiming fraud, breach of contract, and other wrongs in connection with defendant's sale of a business to plaintiff, and seeking recovery in excess of $100 million in compensatory damages, and punitive damages. GTE Corporation moves to dismiss the complaint and for related relief pursuant to Federal Rule of Civil Procedure 12(b)(6), on the ground that the parties are bound by the terms and conditions of their Purchase Agreement dated as of October 29, 1999. I hold that the agreement made by the parties, which defined and allocated their rights, obligations, risks and limits of recovery in the event of breach of the representations, warranties and covenants contained in the Agreement, provides the grounds upon which plaintiff may sue and recover, and I dismiss the complaint insofar as it exceeds those grounds. I grant plaintiff leave to amend its complaint to conform to the rulings expressed in this Opinion and Order.

### I. The Purchase Agreement of October 29, 1999

In June 1999, GTE sold most of the assets of its wholly owned subsidiary, GTE Government Systems Corporation, to General Dynamics Corporation, and spun-off and separately organized the remaining assets. GTE contributed the (spun-off) assets, those not sold to General Dynamics, to a limited liability company, GTE Information Systems LLC ("GTE Information"). In September 1999, GTE transferred its ownership interests in GTE Information to Contel Federal Systems, Inc. ("Contel"), another wholly-owned subsidiary of GTE. The business of GTE Information was to provide telecommunications and information services to government and commercial customers, domestically and internationally.

Contel then sold GTE Information to DynCorp. As of October 29, 1999, DynCorp and Contel entered into a Purchase Agreement, whereby DynCorp agreed to buy, and Contel agreed to sell, all Contel's ownership interests in GTE Information. GTE Corporation ("GTE"), the defendant, agreed to "join in" the transaction to the extent set forth in a schedule to the agreement: essentially, GTE agreed not to compete with DynCorp in relation to the business being sold, and to guarantee Contel's performance of certain indemnification obligations that were set out in Article IX of the Purchase Agreement. The transaction was to close on November 29, 1999, subject to various conditions set out in Article VII of the Purchase Agreement: notably, the absence of a governmental restraint, the obtaining of necessary regulatory approvals and, important to this case, compliance by Contel as Seller with Section 7.2 of the Purchase Agreement. Section 7.2 provided:

(a) ... the representations and warranties of Seller contained [in the Purchase Agreement] ... shall be true and correct in all material respects ... on the date of [the Purchase Agreement] and on the Closing Date....

(b) ... Seller shall have in all material respects performed all obligations and complied with all covenants set forth in [the Purchase Agreement] which are required to be performed or complied with by it at or prior to the Closing....

(e) ... there shall not have been any change in or event affecting the Company [GTE Information] that constitutes a Material Adverse Circumstance....

Material Adverse Circumstance was defined as "any fact, circumstance or condi-

tion" that would "(a) have a material adverse effect on the Business, or on the operations, assets, or financial condition of [GTE Information]" or "(b) . . . result in a loss, liability or obligation . . . having a monetary effect greater than $500,000."

The representations and warranties of the Seller, Contel, referenced in Section 7.2(a), were set out in Article II of the Purchase Agreement. Pursuant to Section 2.3, Contel represented and warranted:

(a) the audited balance sheet . . . and the related statements of income, parent company investment, and cash flows for the year ended December 31, 1998 . . . have been prepared from the books and records of the Company [GTE Information] and Government Systems [the GTE Division prior to the sale of assets to General Dynamics and the contribution of assets to GTE Information] in accordance with GAAP and present fairly, in all material respects, the financial condition and the results of operations of the Business as of the date, and for the period, thereon referenced.[1]

(b) Except as set forth on Schedule 2.3(b), since December 31, 1988, there has not been, occurred or arisen any change or event affecting [GTE Information] that constitutes a Material Adverse Circumstance. . . .

(c) . . . Except as set forth on Schedule 2.3(c), as of the date hereof, [GTE Information] has not incurred any [ ] liabilities in excess of $100,000. . . .

(d) . . . The Adjusted Net Assets of [GTE Information], determined in accordance with GAAP consistently applied . . . shall be no less than $41,000,000 as of the Closing Date.

Contel also represented and warranted, with respect to GTE Information's contracts with the government, that no notice of termination for default, or notice for cure or show cause was in effect or threatened. (Purchase Agreement, § 2.20).

In Article III of the Purchase Agreement, setting out the representations and warranties of the Buyer, DynCorp disclaimed reliance on any representations or warranties by Contel or its affiliates (including GTE) other than those provided in the Purchase Agreement. Thus, DynCorp represented and warranted that it relied, in entering into the Purchase Agreement, not on the mix of data and information supplied to it by GTE and Contel with respect to which it performed its investigating and due diligence work, but only on the "representations and warranties contained in [the Purchase] Agreement." Section 3.8, reflecting DynCorp's disclaimers, provides:

Except for the representations and warranties contained in this Agreement, Buyer acknowledges that [the] Seller . . . makes [no] express or implied representation or warranty with respect to the . . . Company [GTE Information], the Business [the business that Contel is selling and that DynCorp is buying] or otherwise or with respect to any other information provided to Buyer, . . . including as to (a) merchantability or fitness for any particular use or purpose, (b) the operation of the Business by Buyer after the Closing in any manner other than as used and operated by Seller or (c) the probable success or profitability of the ownership, use or operation of the Business by Buyer after the Closing.

Section 3.8 provided also that GTE and Contel were not to be liable to DynCorp because of representations made, or information or data given, before DynCorp and

---

1. The financial statements were for GTE Government Systems Corporation as of December 31, 1998, prior to the sale of most of its assets to General Dynamics, and prior to the spin-off of the remaining business and assets to GTE Information and Contel.

Contel entered into the Purchase Agreement:

Neither Seller nor any other Person will have or be subject to any liability or indemnification obligation to Buyer or any other Person resulting from the distribution to Buyer, or Buyer's use of, any such information, including the Confidential Offering Memorandum dated July 1999 ... related to the Business and any information, documents or material made available to the Buyer in certain "data rooms," management presentations, functional "break-out" discussions, responses to questions submitted on behalf of Buyer, whether orally or in writing, or in any other form in expectation of the transactions contemplated by this agreement.

Article IV of the Purchase Agreement added covenants relating to the period between the effective date of the Purchase Agreement, October 29, 1999, and the Closing, expected to occur a month later, on November 29, 1999.[2] Pursuant to Section 4.1, Contel covenanted that DynCorp and its experts would have access to the books and records of the business being sold, "and all other information with respect to the Business as [DynCorp] may from time to time reasonably request...." Pursuant to Section 4.2, Contel covenanted to make available to DynCorp monthly unaudited balance sheets and income statements for GTE Information, and "a written management discussion and analysis of the Company's financial condition and results of operations consistent with the Company's and its predecessor's past practices ... prepared in accordance with the past practices of the Company consistently applied." Pursuant to Section 5.7 of the Purchasing Agreement, as a "Continuing Covenant," Contel covenanted to deliver audited balance sheets and related statements of income and cash flows for

the GTE Information Systems Division for the year ended December 31, 1997 (two years before the transaction with General Dynamics and the separate organization of GTE Information), and an unaudited balance sheet and related statements of income and cash flows for the Information Systems Division for the nine months ended September 30, 1999.

Article IX of the Purchase Agreement provided the parties' rights and obligations, and limited the remedies, with respect to "Indemnifiable Losses," defined broadly by the Purchase Agreement as "any cost, damage, disbursement, expense, liability, loss, deficiency," etc. Pursuant to Section 9.1, Contel, joined by GTE, agreed to "defend, indemnify and hold harmless" DynCorp (and associated companies and employees) against "any and all Indemnifiable Losses based upon or arising from:" (a) "any inaccuracy in any of the representations and warranties made by Seller on the Closing Date in or pursuant to [the Purchase] Agreement," and (b) "any breach or nonperformance of any of the covenants of Seller contained in [the Purchase] Agreement...."

Section 9.4 limited the duration of the representations and warranties, and of the covenants, with respect to which indemnification claims may be made, to 545 days in the case of representations and warranties, and one year in the case of covenants. If, however, a claim had been asserted and remained unresolved, the duration period was to be extended. Thus, Section 9.4 provided:

Any matter as to which a claim has been asserted by notice to the other party that is pending or unresolved at the end of any applicable limitation period shall continue to be covered by this Article IX ... until such matter is finally terminat-

---

2. The Closing actually occurred December 10, 1999.

ed or otherwise resolved by the parties under [the Purchase] Agreement. . . .

Notices and communications called for by the agreement were to be in writing. (Purchase Agreement, § 10.14).

Section 9.5 limited potential recoveries. Section 9.5 provided that Contel and GTE were not required to pay any Indemnifiable Loss which, in the aggregate, was less than 1.5% or that exceeded 15% of the Purchase Price of $165 million—damages, that is, had to exceed a threshold of $2,475,000 and could not exceed $24,750,000:

> Seller shall not be required to indemnify any Person under Section 9.1(a) unless the aggregate of all amounts for which indemnity would otherwise be payable by Seller exceeds 1.5% of the Purchase Price, and in such event, Seller shall be responsible for only the amount in excess of such 1.5% of the Purchase Price. . . . In no event shall the total indemnification to be paid by Seller under this Article IX exceed 15% of the Purchase Price. . . .

Recoveries were further limited to "actual damages sustained by the Indemnified Party by reason of such breach or nonperformance . . ., net of any insurance proceeds and Net Tax Benefits." The Purchase Agreement provided that the limited indemnification remedy of Article IX was to be "the sole and exclusive remedy for any post-Closing claims . . . made for breach of a representation or warranty," but was not to be the "exclusive remedy for claims arising out of . . . any covenant under this Agreement." (Purchase Agreement, § 9.7). And there could be no recovery for consequential, special or punitive damages, or loss of future income or business opportunity. Thus, Section 10.12 provided:

> Notwithstanding anything to the contrary elsewhere in [the Purchase] Agreement, no party (or its Affiliates) shall, in any event, be liable to the other party (or its Affiliates) for any consequential, special or punitive damages, including loss of future revenue or income, or loss of business reputation or opportunity relating to the breach or alleged breach of [the Purchase] Agreement.

The governing law was to be New York law (Purchase Agreement, § 10.5), and any litigation "arising under or in connection with [the Purchase] Agreement" was to be brought in the state or federal courts in the County of New York (Purchase Agreement, § 10.21). The Purchase Agreement also contained an integration clause:

> the [Purchase] Agreement, the Confidentiality Agreement and the Related Agreements, together with the schedules and exhibits thereto, (i) constitute the entire agreement among the parties pertaining to the subject matter hereof and (ii) supersede all prior agreements and understandings of the parties in connection therewith. . . .

## II. *Plaintiff's Allegations of Negotiations and Breach*

The complaint, covering 24 pages, 64 paragraphs and 16 exhibits, alleges a narrative relating the origin of GTE Information, its organization, the negotiations between GTE, Contel, and DynCorp, and the ultimate sale to DynCorp of GTE Information. Plaintiff alleges that defendant deceived it at every turn, and that plaintiff should therefore recover damages that compensate it for its loss, and reward it with punitive damages because of the egregious nature of defendant's conduct. Plaintiff alleges three theories that authorize a recovery—contract, fraud and negligence—and alleges and realleges each and all the allegations of its narrative as the basis of each of its three claims of relief.

### A. Background of Sale

In mid–1999, DynCorp and GTE began negotiations to purchase and sell GTE Information. GTE gave DynCorp an Offering Memorandum, dated July 1999, which discussed its contracts, customers, results of operations, and projected revenues and profit margins. GTE also gave DynCorp access to a "data room" containing selected financial and other information about the business, and employees of GTE added to this information by discussions of the activities, revenues and future prospects of the business. On September 1, 1999, GTE transferred ownership of GTE Information to Contel Federal Systems, Inc. ("Contel"), a wholly owned subsidiary of GTE with no employees. On October 29, 1999, DynCorp and Contel entered into the Purchase Agreement.

### B. GTE's Alleged Pre–Contract Misrepresentations

DynCorp alleges that GTE misled it about the current and future values and profitability of GTE Information. In particular, DynCorp alleges that GTE intentionally misrepresented the value of a major contract it had with the United States Bureau of Prisons to provide telephone service to inmates ("the BOPITS II contract"), representing that BOPITS II was and would continue to be profitable, and concealing information which would have shown that BOPITS II was unprofitable and experiencing serious problems. DynCorp alleges that as of the end of August 1999, GTE Information had installed only 17 of 54 scheduled sites, that call volume and revenues were lower than expected, and that an internal review found serious customer dissatisfaction, poor management and inadequate personnel resources. DynCorp alleges that GTE Information management had determined, by November 10, 1999, that the BOPITS II contract could not be profitable unless concessions were negotiated with the Bureau of Pris-

ons concerning call volume and pricing. DynCorp alleges that these adverse conditions were not disclosed to it, neither at the time the Purchase Agreement was executed nor prior to closing, and that GTE throughout represented that the BOPITS II contract was and would continue to be profitable and provided misleading financial information to substantiate its false representations.

### C. GTE's Alleged Breaches of Warranties and Covenants

DynCorp alleges that GTE's representations and warranties provided in the Purchase Agreement—that the financial statements pertaining to GTE Information fairly reflected its financial condition and results of operations, that there were no material adverse changes or material undisclosed liabilities, and that adjusted net value at closing would be $41 million— were false and fraudulent, that GTE knew that when it executed the contract, and that DynCorp relied to its detriment.

### D. GTE's Alleged Misrepresentations Post–Contract and Prior to Closing

DynCorp alleges that GTE continued to provide false information about GTE Information and the BOPITS II contract after the Purchase Agreement was executed and prior to closing. DynCorp alleges that the October Financial Summary as of October 31, 1999, provided by GTE on November 24, 1999, failed to disclose losses associated with the BOPITS II contract and overstated net worth, and that GTE's explanations for poorer than expected performance were also false. DynCorp alleges also that information GTE was required to provide under Sections 4.1 and 4.2 of the Purchase Agreement—monthly unaudited balance sheets and income statements and management discussions and analyses of GTE Information's financial

condition and results of operations—were also false in material respects, masked further undisclosed losses, and misstated the business and financial condition of GTE Information.

### E. *DynCorp's Theories of Action and Alleged Damages*

DynCorp alleges three claims for relief, and realleges all its allegations of fact in each count, not making any effort to categorize them according to materiality or legal effect. Count One, for breach of contract, alleges that GTE's misrepresentations concerning BOPITS II and the overall value of GTE Information constituted material breaches of the representations and warranties of Section 2.3 of the Purchase Agreement, and of the covenants of Sections 4.1 and 4.2 of the Purchase Agreement. Count Two, for fraud, alleges that GTE knowingly and fraudulently made its misrepresentations, before and at the time the Purchase Agreement was executed and again, prior to and at closing, that the misrepresentations were material, and that DynCorp relied on them. Count Three, for negligent misrepresentation, alleges that GTE made its misrepresentations negligently.

DynCorp alleges that it suffered, and claims to recover, damages of $100 million, including the costs of restructuring GTE Information's debt, $1.8 million of note prepayment costs, $10 million in surrendered shares, $11 million in transactional expenses, $8 million in additional interest costs, $2.5 million in advisory services, and $24.5 million in interest paid. DynCorp also seeks punitive damages.

GTE's motion attacks the legal sufficiency of DynCorp's claims, even assuming that they can be proved.

### III. *Discussion*

#### A. *Rule 12(b)(6) Standards*

On a motion to dismiss under Rule 12(b)(6), Fed.R.Civ.P. 12(b)(6), all material allegations of the complaint are to be accepted as true, and all reasonable inferences are to be drawn in favor of the nonmoving party. *D'Alessio v. New York Stock Exchange, Inc.,* 258 F.3d 93, 99 (2d Cir.2001). However, if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief," the complaint should be dismissed. *Id.* The court may consider documents referenced in the complaint, as well as its allegations. *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993). Furthermore, since the interpretation of a contract generally is a question of law to be determined by the court, *United States v. Liranzo,* 944 F.2d 73, 77 (2d Cir.1991), the court may dismiss a complaint based on a contract if the contract unambiguously shows that the plaintiff is not entitled to the requested relief. *Marketing/Trademark Consultants, Inc. v. Caterpillar, Inc.,* No. 98 Civ. 2570(AGS), 2000 WL 648162, at *3 (S.D.N.Y. May 19, 2000).

#### B. *The Breach of Contract Claims Against GTE*

DynCorp alleges its claim of breach of contract, not against Contel, the party with which DynCorp is in privity, but against GTE, Contel's parent. In the absence of a claim that GTE is liable for the acts of its subsidiary, GTE's may be liable only on the extent it joined the Purchase Agreement. It "joined" "solely . . . for the purpose of guaranteeing the performance by Seller [Contel] of its obligations under Article IX of [the Purchase] Agreement."

Article IX, Section 9.1, requires Contel to indemnify DynCorp from "any and all Indemnifiable Losses," that is, for Dyn-

Corp's damages and expenses (a) "based on or arising from any inaccuracy in any of the representations and warranties made by Seller [Contel] on the Closing Date in or pursuant to [the Purchase] Agreement" or (b) "based upon or arising from any breach or nonperformance of any of the covenants of Seller contained in [the Purchase] Agreement." GTE guaranteed those obligations of Contel. However, the representations, warranties, and covenants binding Contel and GTE are time limited. The representations and warranties expire on "11:59 p.m. on the 545th day following the closing date;" that is, on June 7, 2001, while the Article IV covenants are time limited "for one year" that is, until December 10, 2000. These limits do not apply, however, to "any matter" as to which a claim has been asserted and remains "pending or unresolved." (Purchase Agreement, §§ 9.4, 9.7). The immediate issue, therefore, is whether or not the contractual time limitations expired before DynCorp made claim or filed suit.

### 1. *The Issue of Timeliness*

■ Under New York law, the parties to a contract may agree to shorten the period of limitations within which an action must be commenced. *See Incorporated Village of Saltaire v. Zagata*, 280 A.D.2d 547, 547–48, 720 N.Y.S.2d 200 (2d Dep't 2001). Although a defendant may raise the affirmative defense that the plaintiff's claim is time-barred on a 12(b)(6) motion to dismiss, a court may grant such a motion only if it is clear from the face of the complaint that the action was not timely-filed. *Ghartey v. St. John's Queens Hosp.*, 869 F.2d 160, 162 (2d Cir.1989). Since DynCorp filed this suit on August 10, 2001—two months after the Section 2.3 representations and warranties and eight months after the Section 4.1 and 4.2 covenants appear to have expired—and did not allege that it previously made claim that any such representations, warranties or

covenants had been breached and that such claim remained unresolved, the breach of contract action against GTE must be dismissed.

However, DynCorp has requested leave to amend its complaint to allege that it made timely claim that the representations and warranties provided by Section 2.3, and the covenants provided by Sections 4.1 and 4.2, were breached. DynCorp proposes to allege that "in a series of extensive communications, both written and oral . . . beginning as early as December 1, 2000, DynCorp timely gave notice to GTE concerning the matters as to which a claim has been asserted in this lawsuit. . . ." DynCorp also refers to its letter to GTE of March 8, 2001, enclosing a draft complaint, and argues that this also constituted timely notice of claim. GTE disputes the legal sufficiency of DynCorp's submissions, and argues that notice was not sufficiently specific, for Section 9.4 provides for an enlargement of time, beyond the 545 and one-year period provided by Article IX of the Purchase Agreement, only as to "matter[s]" as to which a claim was asserted and remains "pending or unresolved."

I grant leave to DynCorp to add allegations of timely notice to an amended complaint. Since Section 9.4 provides different periods of limitation for claims of breach of Section 2.3 representations and warranties, and for Sections 4.1 and 4.2 covenants, DynCorp shall allege, specifically for each such section, such notices as it claims to have given. And since Section 10.14 provides that notice shall be given in writing, DynCorp's amendment shall clearly allege and attach the written notices that it alleges were timely given. Defendant's argument relating to inadequacy of notice is premature at this early stage because it depends on factual allegations not referenced in the complaint, *see Chambers v. Time Warner, Inc.*, 282 F.3d 147,

153–54 (2d Cir.2002), but may be raised by motion at a later time.[3]

DynCorp argues that since Section 9.7 of the Purchase Agreement provides that the remedy provided by Article IX is the "sole and exclusive" remedy for "post-Closing claims ... made for breach of a representation or warranty", but is not the "exclusive" remedy for breach of "any covenant under this Agreement," the short period of limitations provided by Section 9.4 of Article IX should not bar its claim. The argument lacks merit. GTE, since it is not in contractual privity with DynCorp, is potentially liable to it for breach of contract only to the extent that GTE "joined" the DynCorp/Contel Purchase Agreement, and GTE "joined" only to the extent of guaranteeing Contel's obligations under the Indemnification provisions of Article IX, including the provisions of Article IX with regard to time limits and notice. (Purchase Agreement, Schedule "Joinder" ("GTE Corporation hereby joins in this Purchase Agreement solely ... for the purpose of guaranteeing the performance by Seller of its obligations under Article IX of this Agreement.")).

## 2. *Limitation of Potential Damages Recoveries*

DynCorp seeks to recover $100 million in compensatory damages and an unspecified amount of punitive damages pursuant to its breach of contract claim against GTE. The Purchase Agreement, however, limits Article IX indemnification to $24,750,000: 15% of the purchase price of $165 million. (Purchase Agreement,

§ 9.5).[4] In addition, the damages must be "actual damages," sustained "by reason of such breach or nonperformance" of the Section 2.3 representations and warranties and Sections 4.1 and 4.2 covenants, (*id.*) and not "consequential, special or punitive damages." (*Id.*, § 10.12).

Under New York law, sophisticated parties with equal bargaining power can agree to limit the liability that the other may recover from a breach of contract. *Metropolitan Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 84 N.Y.2d 430, 436, 618 N.Y.S.2d 882, 643 N.E.2d 504 (1994); *Peluso v. Tauscher Cronacher Prof'l Eng'rs, P.C.*, 270 A.D.2d 325, 325, 704 N.Y.S.2d 289 (2d Dep't 2000); *Scott v. Palermo*, 233 A.D.2d 869, 870, 649 N.Y.S.2d 289 (4th Dep't 1996); *AT & T v. New York City Human Resources Admin.*, 833 F.Supp. 962, 989 (S.D.N.Y.1993); *see* 5 Corbin on Contracts § 1068, at 386 (1964). "A limitation of liability provision in a contract represents the parties' agreement on the allocation of the risk of economic loss in the event that the contemplated transaction is not fully executed, which the courts should honor" if the limitation is not the result of unconscionable conduct or unequal bargaining power between the parties. *Metropolitan Life*, 84 N.Y.2d at 436, 618 N.Y.S.2d 882, 643 N.E.2d 504; 5 Corbin on Contracts § 1068, at 386 n. 84.5.

DynCorp argues that the limitation of liability provisions should not be enforced if the breach was fraudulent, willful or grossly negligent, citing *AT & T*, 833 F.Supp. at 989–90, *Ally Gargano/MCA Ad-*

---

3. The advisability of early, limited discovery on the issue of notice may be taken up with me at a Case Management Conference. See the last section of this Opinion.

4. The language of Section 9.5 of the Agreement is ambiguous as to whether it limits indemnification to 15% of the total purchase price ($24,750,000), or to the difference be-

tween 15% of the total purchase price and 1.5% percent of the total purchase price ($22,275,000). GTE does not argue for the latter interpretation, and I decline to decide at this point which interpretation of the damages limitation is correct. Some limited discovery concerning the parties' intent concerning this issue may be appropriate.

*ver. v. Cooke Properties, Inc.*, No. 87 Civ. 7311(RWS), 1989 WL 126066 (S.D.N.Y. Oct.13, 1989), and *Williamsburg Food Specialties, Inc. v. Kerman Protection Sys, Inc.*, 204 A.D.2d 718, 719, 613 N.Y.S.2d 30 (2d Dep't 1994). However, the decision of the New York Court of Appeals in *Metropolitan Life* is authoritative, and it holds that an allegation that a breach of contract was willful rather than involuntary does not allow a court to disregard an unambiguous limitation of liability provision agreed to by parties of equal bargaining power. *Metropolitan Life*, 84 N.Y.2d at 435, 618 N.Y.S.2d 882, 643 N.E.2d 504. DynCorp and Contel, both sophisticated parties represented by sophisticated counsel, unambiguously provided the limit of recovery in the event of breach, and I may not rewrite how the parties defined their rights and obligations, allocated their risks, and limited their liabilities and rights of recovery.

I therefore dismiss DynCorp's allegations seeking recovery in contract against GTE in excess of $24,750,000, and seeking damages that are not "actual," or which are "consequential, special or punitive," damages. I also dismiss paragraph 52 of the complaint, alleging that GTE may not rely on the limitation of liability sections of Article IX because "of the fraudulent or grossly negligent breaches of contract."

### 3. *Allegations Immaterial to Breach of Contract*

DynCorp's breach of contract claim against GTE is not limited to allegations of breaches of Section 2.3 representations and warranties and Sections 4.1 and 4.2. DynCorp's claims of breach of contract also reallege, in Count One of the complaint, the entire history of GTE Information, replete with numerous incidents of alleged wrongful behavior on the part of GTE.

DynCorp's narrative is immaterial. Its claim against GTE can proceed only under Article IX, and the specific portions of the Purchase Agreement incorporated in Article IX.

A claim for relief is supposed to be stated by "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8. Failure to abide by this standard can produce great mischief in a case as complex as this one. Unnecessary allegations promote discovery abuse, contentiousness and difficulties in understanding and treating the case for motions, legal sufficiency and trial. Accordingly, paragraph 47 of DynCorp's complaint, realleging its entire narrative, is stricken. DynCorp may reallege only those paragraphs directly relevant to its breach of contract claim against GTE: breach, that is, of the Section 2.3 representations and warranties and the Sections 4.1 and 4.2 covenants, alleged in paragraphs 48 through 51 of the complaint.

### C. *Fraud Claims*

DynCorp alleges, as Count Two of its complaint, that GTE and Contel made fraudulent and misleading representations concerning the value, current operations, and future profitability of GTE Information, during negotiations and due diligence before the Purchase Agreement was executed, in the Purchase Agreement itself, and between the execution of the Purchase Agreement and the closing of the transaction. DynCorp claims that it has stated a claim for fraud under New York law: (1) that GTE made representations of material facts, (2) that were false, (3) with the intention to defraud, (4) that DynCorp reasonably relied on GTE's misrepresentations, and (5) that DynCorp suffered resulting damages. *See Small v. Lorillard Tobacco Co., Inc.*, 94 N.Y.2d 43, 57, 698 N.Y.S.2d 615, 720 N.E.2d 892 (1999);

*Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.,* 98 F.3d 13, 19 (2d Cir.1996).

### 1. *Fraud Claims Based on Pre–Contractual Misrepresentations*

■ DynCorp alleges that GTE fraudulently induced it to enter into the Purchase Agreement of October 29, 1999 with Contel by misrepresenting the financial condition and results of operations of GTE Information and the projected revenues of the BOPITS II contract, in the 1999 Offering Memorandum given to DynCorp in July 1999, in presentations to DynCorp in August 1999, and in other written materials describing untrue high ratings for its service to customers and its technical expertise.

DynCorp expressly acknowledged, however, in Section 3.8 of the Purchase Agreement, that the "Seller ... makes [no] express or implied representation or warranty" with respect to "the business" being sold "or otherwise," or its "probable success or profitability," "or with respect to any other information" provided to DynCorp. DynCorp acknowledged, further, that "[n]either Seller nor any other Person will have or be subject to any liability or indemnification obligation" resulting from the distribution to DynCorp or its use of "the Confidential Offering Memorandum" or "any information, documents or material made available ... in certain 'data rooms,' management presentations, functional 'break-out' discussions, responses to questions ..., or in any other form...." DynCorp thus disclaimed reliance on the pre-contractual representations which form the basis of its claim of fraudulent inducement to enter the Purchase Agreement. The only exceptions to DynCorp's disclaimers are "the representations and warranties contained in the Agreement." (Purchase Agreement, § 3.8).

DynCorp's particularized disclaimers make it impossible for it to prove one of the elements of a claim of fraud: that it reasonably relied on the representations that it alleges were made to induce it to enter into the Purchase Agreement. *Danann Realty Corp. v. Harris,* 5 N.Y.2d 317, 320–21, 184 N.Y.S.2d 599, 157 N.E.2d 597 (1959). A party to a contract cannot allege that it reasonably relied on a parol representation when, in the same contract, it "specifically disclaims reliance upon [that] particular representation." *Harsco Corp. v. Segui,* 91 F.3d 337, 345 (2d Cir.1996).

*Danann Realty* involved the sale of the lease to a building. Plaintiff alleged that it was induced to enter into the contract of purchase and sale by the seller's misrepresentations of the operating expenses of the building and the profits to be derived from the investment, and sued for damages resulting from the fraudulent misrepresentations. In the contract, however, the buyer had acknowledged that the seller was not making any representations as to "rents, leases, expenses, operation or any other matter or thing affecting or related to the aforesaid premises, except as herein specifically set forth," and that it entered into the contract "after full investigation, neither party relying upon any statement or representation, not embodied in this contract, made by the other." *Id.* at 320, 184 N.Y.S.2d 599, 157 N.E.2d 597. The New York Court of Appeals, reversing the Appellate Division and reinstating the order of Special Term, ordered the complaint dismissed. Judge Burke, writing for a six-out-of-seven majority, ruled that where plaintiff, "in the plainest language announced and stipulated that it is not relying on any representations as to the very matter as to which it now claims it was defrauded," the plaintiff's fraud claim should be dismissed. *Id.* at 320, 184 N.Y.S.2d 599, 157 N.E.2d 597.

Such a specific disclaimer destroys the allegations in plaintiff's complaint that the agreement was executed in reliance upon these contrary oral representations..

*Id.* at 320–21, 184 N.Y.S.2d 599, 157 N.E.2d 597. Businessmen dealing at arm's length should be able to agree, Judge Burke ruled, "that the buyer is not buying in reliance on any representations of the seller as to a particular fact." *Id.* at 323, 184 N.Y.S.2d 599, 157 N.E.2d 597. And the ruling on the legal sufficiency of a complaint based on such representations may properly be made on the complaint and contract alone, without waiting for discovery.

Judge Fuld, dissenting, argued that the disclaimer clause was essentially "boilerplate," and that regardless and in view of cases traced back to the English Chancellor, "no one [should be able to] escape liability for his own fraudulent statements by inserting in a contract a clause that the other party shall not rely upon them." *Id.* at 326–28, 184 N.Y.S.2d 599, 157 N.E.2d 597 (Fuld, J., dissenting). The majority nevertheless rejected Judge Fuld's discussion, and affirmed the contract, and the ability of contracting parties under New York law to allocate their respective rights, obligations and risks, and to disclaim or limit the ability of one to sue the other for untrue or fraudulent misrepresentations.

In *Harsco Corp. v. Segui*, 91 F.3d 337, 345 (2d Cir.1996), the Second Circuit Court of Appeals applied the rule of *Danann Realty* to the purchase and sale of a business. Harsco Corp. was interested to expand its production and marketing of steel products internationally by purchasing the stock of MultiServ, a Netherlands company. MultiServ's representatives represented that a set of projections, given to Harsco to induce it to enter into a contract of purchase, "reflected conserva-

tive economic assumptions and accounted for the prospects of 'questionable plants.' " In additional negotiations, Harsco asked for further details from MultiServ's chief financial officer, but did not receive all the MultiServ documents that it had requested. The contract of purchase and sale between Harsco and MultiServ's owners provided that this due diligence was for the purpose of "confirming the accuracy of the representations and warranties of the [sellers]," and that Harsco had the right to terminate the deal during a fourteen-day period if it determined that the seller's representations were not true and accurate in all material respects. The agreement provided that Harsco disclaimed representations by the sellers that were not provided in the agreement, and acknowledged that the sellers were not warranting "projections, estimates or budgets ... of future revenues, expenses or expenditures, future results of operations, ... or any other information or documents made available" to Harsco. *Id.* at 342. A merger clause provided that the written agreement was the entire agreement and superseded all prior arrangements or understandings.

Harsco, after its due diligence, determined to proceed, and paid the cash and assumed the debt necessary to close the transaction. Later, it determined that the business it purchased was not the business that had been represented to it; the status of MultiServ's plant construction, the financial prospects for its operations, and the status of its intellectual property rights had all been misrepresented. Harsco sued for breach of contract and alleged a variety of fraud and misrepresentation theories, much like DynCorp's suit here.

The district court dismissed the complaint, on the complaint and contract and before discovery, and the court of appeals affirmed. The Second Circuit ruled that because the buyer had disclaimed all but

the representations and warranties explicitly provided by the written contract, the buyer could not show that it reasonably relied on the misrepresentations on which it based its claim. "We think," the court of appeals ruled, "that Harsco should be treated as if it meant what it said when it agreed in Section 2.05 that there were no representations other than those contained in Sections 2.01 through 2.04 that were part of the transaction." *Id.* at 346.

*Harsco*, like the DynCorp case before me, involved a claim that not all documents were produced in response to the buyer's request, and that the documents not produced would have shown that the picture presented by the sellers was not a true picture. The Court of Appeals dismissed Harsco's claim, ruling that "it cannot be said that denial of a request to see documents could constitute fraud, unless that denial suggested falsely and deceitfully that those documents did not exist (of which there is no suggestion here)." *Id.* at 347; *see also Grumman Allied Indus., Inc. v. Rohr Indus., Inc.,* 748 F.2d 729, 735 (2d Cir.1984) ("where the parties to an agreement have expressly allocated risks, the judiciary shall not intrude into their contractual relationship;" a party cannot complain of having been misled if "the substance of the disclaimer provisions tracks the substance of the alleged misrepresentations, notwithstanding semantical discrepancies").

DynCorp's disclaimers, expressed in Section 3.8 of the Purchase Agreement, match the representations on which it bases its claim of pre-contractual fraud. Under the rule of *Danann Realty* and *Harsco*, those aspects of its claim must be stricken.

### 2. The Peculiar Knowledge Exception is not Applicable

DynCorp argues that even though it disclaimed reliance on representations made by the seller outside the contract, it nevertheless should have the right to sue for fraud because it was misled by misrepresentations concerning facts of which GTE had "peculiar knowledge." The information that GTE gave it, DynCorp alleges, was "selective," painting an inaccurate picture of the current and future profitability of the BOPITS II contract. DynCorp alleges that GTE withheld information that its implementation of the BOPITS II contract was behind schedule, plagued with technical difficulties and losing money. DynCorp argues that it could not reasonably have discovered this information by its investigations. DynCorp relies on a dictum of *Danann Realty Corp.:*

> [I]f the facts represented are not matters peculiarly within the party's knowledge, and the other party has the means available to him of knowing, by the exercise of ordinary intelligence, the truth or the real quality of the subjective representation, he must make use of those means, or he will not be heard to complain that he was induced to enter into the contract by misrepresentations.

*Id.,* 5 N.Y.2d at 322, 184 N.Y.S.2d 599, 157 N.E.2d 597.

DynCorp was aware, however, that the information it had received had been selected, and that it had not received any warranty that the information was representative of the business it was interested to purchase. Indeed, DynCorp disclaimed reliance on the mix of information that it had received, for Section 3.8 of the Purchase Agreement specifically provided that the Seller would not be liable to DynCorp based on claims arising from the information provided to it, but only for the specific representations, warranties and covenants of the Purchase Agreement. The disclaimer was broad, and related to all information given to DynCorp: the "Confidential Offering Memorandum", the "documents

or material made available to the Buyer in certain 'data rooms,'" "management presentations, functional 'breakout' discussions, responses to questions," and "any other form in expectation of the transactions contemplated by this agreement." As DynCorp acknowledged in its complaint, GTE gave it *some*, not all, the information that DynCorp requested. (Complaint, at ¶ 43 & Exs. J, K).

Sophisticated parties to major transactions cannot avoid their disclaimers by complaining that they received less than all information, for they could have negotiated for fuller information or more complete warranties. Thus, in *Rodas v. Manitaras*, 159 A.D.2d 341, 552 N.Y.S.2d 618 (1st Dep't 1990), the buyer of a restaurant business complained that the seller had misrepresented its weekly income and that, even though it had disclaimed reliance on representations of "past, present or prospective income or profits," it should be allowed to sue for fraud. The buyer argued that because the seller refused to allow access to its books and records, the facts misrepresented were peculiarly within the knowledge of the seller. The court rejected the seller's argument, holding that since the seller had proceeded with the transaction "without securing the available documentation or inserting appropriate language in the agreement for his protection, he may truly be said to have willingly assumed the business risk that the facts may not be as represented." *Id.*, at 343, 552 N.Y.S.2d 618; *see also Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F.2d 729, 737 (2d Cir.1984) ("The principle that access bars claims of reliance on misrepresentations has been expressly recognized by this Court.... Where sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance.").

In *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1543 (2d Cir.1997), the buyer of a pool of bank debt refused to close the transaction, contending that it had been misled by the seller's oral representations of its qualities. In the portion of the decision discussing whether the buyer's reliance on the seller's representation was justifiable, the Court of Appeals, following *Grumman* and *Rodas*, held that the buyer could not take advantage of the "peculiar knowledge" exception.

As a substantial and sophisticated player in the bank debt market, Protective [the buyer] was under a further duty to protect itself from misrepresentation. It could easily have done so by insisting on an examination of the Scheme Report [a report upon which the seller based its representations] as a condition of closing.

*Lazard Freres*, at 1543.

In the case before me, DynCorp specifically disclaimed reliance on pre-contractual representations or the mix of information provided to it. It relied on specific representations and warranties set out in Section 2.3, and covenants set out in Sections 4.1 and 4.2, of the Purchase Agreement. It could have negotiated for further access or more complete representations, but it either declined, or was unable, to do so. It is not the role of the courts to relieve sophisticated parties from detailed, bargained-for contractual provisions that allocate risks between them, and to provide extra-contractual rights or obligations for one side or the other. *See Grumman Allied Indus.*, 748 F.2d at 735 (following *Danann Realty Corp.*; "where parties to an agreement have expressly allocated risks, the judiciary shall not intrude into their contractual relationship.").

This is not a case where it is claimed that GTE's alleged fraud was hidden in its

accounting records, requiring extraordinary effort and sophisticated consultants to unmask. *Cf. Dimon Inc. v. Folium, Inc.*, 48 F.Supp.2d 359 (S.D.N.Y.1999). In *Dimon*, the plaintiffs claimed that they were fraudulently induced to overpay for a corporate acquisition by a "carefully masked accounting scheme" orchestrated by the defendant sellers to misrepresent and overstate the value of the acquired company, and which went undetected even by the company's public auditors. *Id.* at 362. Although the contract in *Dimon* also contained disclaimers that the sellers made no "representation or warranty, either express or implied, as to the accuracy or completeness of any of the information made available" to the plaintiffs, and further relieved the sellers of liability for any "information provided . . . or statements made" to the purchasers except to the extent of express representations and warranties made in the contract itself, *id.* at 367, there was nothing that the buyer could practically do to investigate the statements made to it and uncover the imbedded fraud. This impracticality of detection led United States District Judge Lewis A. Kaplan to distinguish *Dimon* from the cases cited above, and to allow plaintiff's fraud claim to proceed beyond the pleadings stage.

The plaintiff in *Dimon* was suing, not because the disclosed mix of information failed to tell a fair and complete story, but because of imbedded fraud in the very books and records and audited financial statements of the company to which it was given access. Judge Kaplan found, in *Dimon*, that the buyer's further investigation could not have uncovered that fraud. Similarly, in *Tahini Investments Ltd. v. Bobrowsky*, 99 A.D.2d 489, 490, 470 N.Y.S.2d 431 (2d Dep't 1984), the buyer of a parcel of land could not reasonably have discovered that 15 drums of hazardous material were buried underneath the property. Here, however, DynCorp knew that it had not received full information concerning GTE Information and the BOPITS II contract when it signed the Purchase Agreement. Nevertheless, DynCorp accepted the disclaimers of Section 3.8, the limitations of damage recoveries provided by Article IX, and the short limitations periods also provided by Article IX, and relied on the sufficiency of the Section 2.3 representations and warranties and the Sections 4.1 and 4.2 covenants. Where there is no suggestion that unequal bargaining power coerced contractual disclaimers or other concessions, a court should not rewrite the allocations of risks, rights and obligations agreed to by the parties.

### 3. Whether Claims of Fraud may be Pursued if also Constituting Breaches of the Representations and Warranties Provided by the Purchase Agreement

DynCorp complains that GTE's breaches of the representations and warranties provided by the Purchase Agreement were willful and fraudulent, and that it should therefore be able to sue GTE for fraud as well as for breach of contract. DynCorp alleges that, contrary to the representations and warranties of Section 2.3 and willfully and fraudulently, GTE Information had incurred (a) Material Adverse Circumstances since December 31, 1998 and (b) material undisclosed liabilities, and (c) its Adjusted Net Assets were less than $41 million at closing. DynCorp claims that it reasonably relied upon GTE's false warranties and representations in entering into the Purchase Agreement.

The issue before me is whether claims for fraud may be maintained independently of a claim for breach of contract, when it appears that the party's agreement was intended to preclude such claims. This intent of the parties is reflected in several sections of the Purchase Agreement,

among them: Section 3.8, which provides that the Seller "makes [no] express or implied representation or warranty," and will have "no liability or indemnification obligation to Buyer," "[e]xcept for the representations and warranties contained in this Agreement;" Sections 9.1 and 9.5, which provide that GTE's potential liability is to be limited to "any inaccuracy in any of the representations and warranties made by Seller on the Closing Date in or pursuant to [the Purchase] Agreement," and which limits potential liability to "Indemnifiable Losses" under the Purchase Agreement which do not in the aggregate exceed 1.5% of the Purchase Price and are less than 15% of the Purchase Price; Section 9.7, which provides that the remedies provided by Article IX were the "sole and exclusive" remedies for "breach of representation or warranty under this Agreement"; and Section 10.21, which provides that the Purchase Agreement (and other agreements not relevant to this dispute) "constitute the entire agreement" and "supersede all prior agreements and understandings."

■ Under New York law, a claim of fraud for breaching representations and warranties provided by a contract is not legally sufficient unless the complaining party can "(i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation or breach collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentations and breaches and are unrecoverable as contract damages." *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir.1996) (restating New York law).

■ GTE's duty to DynCorp was defined entirely by their contractual relationship, as the discussion in the previous sections of this opinion makes clear. GTE owed no duty to DynCorp except as provided in the Purchase Agreement that Contel and DynCorp executed as of October 29, 1999. DynCorp cannot satisfy the first criterion of *Bridgestone/Firestone*.

The second and third criteria of *Bridgestone/Firestone* are less easily resolved. DynCorp argues that since GTE's alleged fraudulent misrepresentations were of present facts rather than future promises, the misrepresentations may be considered "collateral or extraneous" to the contract. DynCorp also argues that since the Purchase Agreement capped damage recoveries against GTE to 15% of the $156 million purchase price (Purchase Agreement, § 9.5), its damages in excess of that difference may be considered "special damages" that are "unrecoverable as contract damages." For the reasons discussed below, I hold that DynCorp's arguments lack merit, and I therefore dismiss DynCorp's fraud claims based on the breach of contractual warranties and representations in the Purchase Agreement itself as duplicative of its claims for breach of contract.

In *Bridgestone/Firestone*, the plaintiff had contracted with a collection agency to obtain collection of delinquent credit card accounts, to remit collected funds bi-weekly, to maintain records of collection efforts, and to submit monthly reports. The collection agency, however, destroyed records despite contractual and subsequent promises not to do so, and stole money from the funds that it had collected. The district court held that these activities amounted to fraud on the part of the collection agency and its principal, and granted a recovery to plaintiff in the amount that it estimated was stolen and for attorneys' fees. The Court of Appeals reversed the finding of fraud and the award of attorneys' fees. The Court of Appeals held that the representations of defendants were not "collateral or extraneous to the terms of the parties' agreement," that defendants did

not owe a duty to plaintiff "distinct from their obligation to perform under the collection agreement," and that the award of attorneys' fees, not having been clearly authorized by the parties' agreement, could not be sustained. *Id.* at 20–21.

DynCorp's claims of fraud also are not "collateral or extraneous to the terms of the parties' agreement," since the false representations that they allege are the representations and warranties that are provided in Section 2.3 of the Purchase Agreement. DynCorp argues, however, that there is a distinction between a representation and warranty of a present fact, and a covenant or promise to do something in the future, during the pendency of a contract. DynCorp thus argues that it may claim both fraud and breach of contract for misrepresentations of present facts, even if such representations were also contractual warranties. Its argument concedes, however, that part of its claim is based on breaches of promises concerning future events: the representation that GTE Information's Adjusted New Worth will not be less than $41 million at closing. (Purchase Agreement, §§ 2.3(d)). DynCorp's argument is therefore confined to the representations and warranties regarding the fairness of the financial statements incorporating GTE Information's business and assets for the year ended December 31, 1998, the year prior to the Purchase Agreement, and the non-occurrence since that date of undisclosed Material Adverse Circumstances. (*Id.,* §§ 2.3(a), (b)).

*Deerfield Communications Corp. v. Chesebrough–Ponds, Inc.,* 68 N.Y.2d 954, 956, 510 N.Y.S.2d 88, 502 N.E.2d 1003 (1986), cited and distinguished by *Bridgestone/Firestone,* involved parol representations concerning geographic restrictions limiting product resales that were not contained in the contract, but which were not negatived by the contract; hence, the parol representations were held "collateral or extrinsic" to the contract, and were thus enforceable. Similarly, in *Cohen v. Koenig,* 25 F.3d 1168, 1170, 1172 (2d Cir.1994), sellers of the assets of a business were allowed to sue the buyers for fraudulently misrepresenting their financial condition and thereby inducing the sellers to accept part of the purchase price in credit. The Court of Appeals held that since the misrepresentations were made before the formation of the contract and were "extraneous to the contract," the sellers had stated a legally sufficient claim of fraud.

The sellers in *Chase v. Columbia Nat'l Corp.,* 832 F.Supp. 654, 660 (S.D.N.Y. 1993), *aff'd,* 52 F.3d 312 (2d Cir.1995), overstated the book value of the business being sold by overstating and double-counting closing inventory of scrap metal and accounts receivable in a manner that made their fraud extremely difficult to detect. The contract provided that the sellers guaranteed the business' net worth, and limited damages to the reduced net worth, or indemnification of the buyer's loss. The contract also provided a short period within which suit could be brought. The district court held that the buyers could sue in tort as well as contract, and that the contract's short period of limitations would not bar the action in tort. The court found that the contract did not negate reliance by the buyers on the seller's pre-contractual representations, that is, on representations that were collateral and extraneous to the representations provided by the contract, thus justifying the action for fraud. *See, generally, Four Finger Art Factory, Inc. v. Dinicola,* No. 99 Civ. 1259, 2000 WL 145466, at *4 (S.D.N.Y. Feb.9, 2000) (discussing the "apparent tension" between different strains of New York cases in applying the "collateral or extraneous" rule discussed in *Bridgestone/Firestone* ); *VTech Holdings Ltd. v. Lucent Techs., Inc.,* 172 F.Supp.2d 435,

440–41 (S.D.N.Y.2001) (same); *compare Varo, Inc. v. Alvis PLC,* 261 A.D.2d 262, 691 N.Y.S.2d 51 (1st Dep't 1999) (oral warranty regarding absence of environmental hazards on property being sold, held, not "collateral" to contractual provisions of indemnity; thus, contract, and not fraud, statute of limitations applied to cause dismissal of suit), *with Thomas Kernaghan & Co. v. Global Intellicom, Inc.,* No. 99 Civ. 3005, 2000 WL 640653 (S.D.N.Y. May 17, 2000) (oral representation regarding absence of adverse claims and suits, held, "collateral" to similar warranty in written contract).

In the case at bar, unlike other cases cited by plaintiff, the Purchase Agreement made clear that GTE would have "no liability or indemnification obligation to Buyer," "[e]xcept for the representations and warranties contained in this Agreement." This condition of exclusivity was sounded throughout the Purchase Agreement, in the sections providing DynCorp's disclaimers, in the sections limiting damage recoveries, and generally, as my citations a few pages earlier make clear. DynCorp's claims of fraud concerning the breach of contractual warranties are not "collateral or extraneous" to these terms and conditions; rather, they contradict them. If I were to rule otherwise, the strong New York policy, giving autonomy to contracting parties to allocate risks, and rights, obligations, warranties and disclaimers, as they see fit, would be compromised. *See Danann Realty Corp. v. Harris,* 5 N.Y.2d 317, 320–21, 184 N.Y.S.2d 599, 157 N.E.2d 597 (1959) (discussed *supra* ). DynCorp cannot satisfy the second criterion of *Bridgestone/Firestone.*

The third criterion of *Bridgestone/Firestone* involves the question whether DynCorp has alleged, or can allege, "special damages" that are "unrecoverable as contract damages" as the proximate result of GTE's fraudulent representations. Dyn-Corp alleges that it suffered damage because (a) the value of GTE Information was significantly less than it should have received; (b) it refinanced its debt, paying a prepayment penalty of $1,834,986, and surrendered its shares having a fair market value of $10 million in order to gain funds with which to pay the purchase price of $165 million; (c) it incurred transactional expenses related to the financing, of approximately $11 million; (d) it paid $2.5 million for advisory services and, since the closing, (e) it paid incremental interest in excess of $24.5 million and higher interest cost on its new debt in the amount of approximately $8 million, and (f) it has been bearing losses associated with the performance of the BOPITS II contract. (Compl., ¶ 46)

Special damages, in the context of commercial fraud, arise in consequence of a breach and seek to compensate a plaintiff for losses other than the diminished value of the promised performance. *Bibeault v. Advanced Health Corp.,* No. 97 Civ. 6026, 2002 WL 24305, *6 (S.D.N.Y. Jan.8, 2002) (citing New York cases). The circumstances giving rise to such damages must reasonably be anticipated at the time the contract was made. *Id.* In *Deerfield Communications Corp.,* 68 N.Y.2d 954, 510 N.Y.S.2d 88, 502 N.E.2d 1003 (1986), the seller was forbidden to sell certain aerosol products because of federal regulations, and was interested to sell the products to a company that represented it would sell the products in overseas markets other than those specifically proscribed. The representation did not became a covenant of the contract, and the buyer disregarded its representation that it would not sell the products in the proscribed areas. The New York Court of Appeals held that a fraud action could be maintained, ruling that the representation was neither "collateral" nor "duplicative" of the contract, and that the seller was seeking, not the dimin-

ished value of the contract, but special damages arising from its need to locate, repurchase and destroy the offending merchandise. *Id.* at 956, 510 N.Y.S.2d 88, 502 N.E.2d 1003. *Cf. VTech Holdings Ltd. v. Lucent Tech. Inc.,* 172 F.Supp.2d 435, 440–41 (S.D.N.Y.2001) (damages flowing from wilfulness of breach allowed to exceed contract limitations where contract provision so allows).

The damages pleaded by DynCorp were incurred either to enable it to acquire GTE Information, or because GTE Information did not turn out to be as profitable as DynCorp hoped. Damages such as this do not qualify for "special damages." They are not specially required expenses intended to eliminate a condition which the contracting party had promised either to eliminate or not to bring about. Rather, DynCorp's damages result from the diminished value of the assets it contracted to purchase.

There is, additionally, another reason why DynCorp's allegation of damage is not legally sufficient. DynCorp agreed, pursuant to Section 10.12 of the Purchase Agreement:

> Notwithstanding anything to the contrary elsewhere in this Agreement, no party (or its Affiliates) shall, in any event, be liable to the other party (or its Affiliates) for any consequential, special or punitive damages, including loss of future revenue or income, or loss of business reputation, or opportunity relating to the breach or alleged breach of this Agreement.

DynCorp is unable to satisfy the third criterion, as well as the first two criteria, of *Bridgestone/Firestone,* as to its claims that the representations and warranties in the Purchase Agreement itself constituted fraudulent misrepresentations. Accordingly, the fraud claims based on the alleged breach of the warranties and representations in Section 2.3 of the Purchase Agreement, like the fraud claims based on alleged pre-contractual misrepresentations by GTE, are dismissed.

### 4. *Liability for Fraud, Post–Contract and Prior to Closing*

■ DynCorp alleges that after the Purchase Agreement was executed, and before closing, GTE gave it monthly financial reports and management discussions and analyses of the business of GTE Information. The covenants of Sections 4.1 and 4.2 of the Purchase Agreement required such information and materials to be given as a condition of the closing. DynCorp alleges that the reports, the management discussions and analyses, and, generally, the information provided by GTE during this period were intentionally false and misleading, and that DynCorp relied upon this information in proceeding to close on the transaction. DynCorp alleges that GTE therefore should be liable for fraud as well as for breach of the contractual covenants. I hold that DynCorp may have leave to state such a fraud claim in an amended complaint.

Article IV of the Purchase Agreement sets out the covenants with respect to the period after the Agreement was executed and prior to closing. Under Section 4.1, Contel agreed to provide DynCorp access to GTE Information's "properties, books, records ... and all other information" with respect to GTE Information as DynCorp "may from time to time reasonably request" after the Purchase Agreement was signed and prior to closing. Under Section 4.2, between the date of the Purchase Agreement and the Closing Date, Contel agreed to provide monthly unaudited balance sheets and income statements for GTE Information, and written management discussions and analyses of its financial condition and results of operations, consistent with past practices. DynCorp

alleges that GTE employees gave it false and misleading information pursuant to these access and disclosure obligations, and misrepresented the reasons for Dyn-Corp's poorer than expected performance.

This fraud claim concerning post-contract representations by GTE and Contel differs from DynCorp's other fraud claims in two important respects. First, Dyn-Corp did not expressly disclaim reliance on the post-contract information and reports provided by GTE. (Purchase Agreement, § 3.8). And, second, the representations and warranties provided by the Purchase Agreement, even though extending in part to the closing date (Purchase Agreement, § 7.3(a)), do not by their terms extend to, or preclude reliance on, the information and reports provided by GTE pursuant to Sections 4.1 and 4.2.

The Seller's obligations to provide access to its books and records, and to provide monthly unaudited financial reports and management discussions and analyses, were express preconditions of closing (Purchase Agreement, § 7.2(b)). Clearly, Dyn-Corp relied on the fairness and accuracy of that which Contel and GTE provided. Furthermore, DynCorp is not limited to the remedies provided Article IX of the Purchase Agreement for breach of the Sections 4.1 and 4.2 covenants, for, unlike a breach of Section 2.3 representations and warranties, the remedies provided by the Purchase Agreement are not "sole and exclusive." (Purchase Agreement, § 9.7).

Accordingly, the Purchase Agreement itself does not preclude DynCorp from suing GTE for making allegedly false and misleading representations and disclosures incident to closing, for these were collateral and extraneous to the express warranties and representations provided by the Purchase Agreement. *See Bridgestone/Firestone*, 98 F.3d at 20.

I therefore hold that DynCorp may have leave to allege a claim of fraud based on post-contract and pre-Closing events, not inconsistent with the preceding discussion. In all other respects, DynCorp's fraud claim—Count Two of the complaint—is dismissed.

### D. *Negligent Misrepresentation*

█ In addition to its fraud claims based on GTE's alleged misrepresentations concerning GTE Information and the BOPITS II contract, DynCorp alternatively pleads a claim for negligent misrepresentation based on the same alleged misrepresentations. For the reasons stated below, the negligent misrepresentation count of the complaint, Count Three, is also dismissed.

### 1. *No Reasonable Reliance on Pre-Contract Misrepresentations*

In order to plead a claim for negligent misrepresentation, just as for fraud, a plaintiff must adequately plead reasonable reliance upon the alleged misrepresentations by the defendant. *Heard v. City of New York*, 82 N.Y.2d 66, 74, 603 N.Y.S.2d 414, 623 N.E.2d 541 (1993). As I have discussed earlier in this decision, the language in Section 3.8 of the Purchase Agreement absolving GTE from liability for essentially all of its pre-contractual representations obviates any claim by DynCorp that it reasonably relied upon those representations or information. *See Harsco Corp. v. Segui*, 91 F.3d 337, 342–43 (2d Cir.1996) (contractual disclaimers precluded reasonable reliance resulting in dismissal of fraud and negligent misrepresentation claims); *Goodman Manuf. Co. v. Raytheon Co.*, No. 98 Civ. 2774(LAP), 1999 WL 681382, at *16 (S.D.N.Y. Aug.31, 1999) (same).

### 2. *No "Special Relationship" Between the Parties*

While DynCorp did not disclaim reliance on the representations and warranties

made by Contel or GTE in the Purchase Agreement itself or after the Purchase Agreement was executed but before closing, the lack of a "special relationship" between it and GTE requires dismissal of these negligent misrepresentation claims as well. "Under New York law, there is no cause of action for negligent misrepresentation absent a 'special relationship of trust or confidence between the parties.'" *St. Paul Fire & Marine Ins. Co. v. Heath Fielding Ins. Broking Ltd.* 976 F.Supp. 198, 204 (S.D.N.Y.1996) (quoting *American Protein Corp. v. AB Volvo,* 844 F.2d 56, 63–64 (2d Cir.1988)). Such a special relationship of trust generally does not exist between sophisticated commercial entities entering into arms-length business transactions, *United Safety of America, Inc. v. Consolidated Edison Co. of New York,* 213 A.D.2d 283, 286, 623 N.Y.S.2d 591 (1st Dep't 1995), and none is alleged here. Accordingly, DynCorp's negligent misrepresentation claims are dismissed.

### IV. *Conclusion*

With respect to DynCorp's first count, for breach of contract, GTE's motion to dismiss is granted, with leave to DynCorp to replead to show that its claim is not time-barred. GTE's motion to dismiss DynCorp's claim for contract damages in excess of $24,750,000, and its claims for consequential and punitive damages, is granted.

With respect to DynCorp's second count, for fraud, GTE's motion to dismiss is granted, with leave to DynCorp to replead only those fraud claims concerning post contract, preclosing conditions and events.

With respect to DynCorp's third count, for negligent misrepresentation, GTE's motion to dismiss is granted.

DynCorp is given leave to serve and file an amended complaint, not inconsistent with my rulings in this opinion, by August 19, 2002. GTE's Answer will be due September 18, 2002. I will meet with counsel for a Case Management Conference on September 27, 2002, at 9:30 a.m., in Courtroom 14D, 500 Pearl Street, to discuss all matters relating to the pleadings, motions and discovery, including whether to limit initial discovery thereunder to support any good faith intention to serve and file any dispositive motion directed to the amended pleadings. Either party desiring such limitation shall arrange for service and filing of supporting and opposition submissions, in a single submission jointly prepared to show supporting and opposing positions, three days in advance of said date.

SO ORDERED.