**GREAT EARTH INTERNATIONAL FRANCHISING CORP.,**
Plaintiff,

v.

**MILKS DEVELOPMENT,**
et al., Defendants.

Nos. 01 Civ.141(AKH),
02 Civ.6194(AKH).

United States District Court,
S.D. New York.

March 3, 2004.

Philip S. Ross, Hoffinger Stern & Ross, LLP, New York City, for Plaintiff.

Peter A. Dankin, McPheters & Dankin, P.C., New York City, for Defendants.

### OPINION AND ORDER REGULATING CLAIMS AND PROOFS, AND STRIKING JURY DEMAND

HELLERSTEIN, District Judge.

This case stems from an attempt to enter the growing Canadian market for health products such as vitamins and dietary supplements. The parties envisioned a network of stores throughout Canada that would satisfy the popular demand for those products. What resulted instead were disappointments, acrimony and, ultimately, this lawsuit.

This case is now approaching the eve of trial, which is scheduled to begin on April 19, 2004. A final settlement conference held on September 30, 2003, was successful only in demonstrating how far apart the parties remain. With the trial date looming, each side is eager to gain tactical advantage and to limit the scope of the other's claims. Plaintiff has renewed one earlier motion and brought a second, and defendants have added a motion of their own. Before me are these three motions: (1) plaintiff's renewed motion for summary judgment and motion in limine on defen-

dants' fraud defense and counterclaims; (2) plaintiff's motion in limine to exclude evidence relevant to defendants' claims for lost profits; and (3) defendants' motion to strike plaintiff's demand for a jury trial. For the reasons stated below, I deny plaintiff's first motion, subject to important qualifications, grant plaintiff's second motion, and grant defendants' motion.

### I. Facts

Plaintiff Great Earth International Franchising Corp. ("Great Earth" or "GEIFC") is an American franchisor of health and dietary supplement stores. Defendant 1039405 Ontario, Inc. ("Ontario") is a Canadian corporation which contracted, under a Master Franchise Agreement ("MFA") dated May 14, 1996 and several Additional Agreements, to become GEIFC's Master Franchisee in Ontario and to establish franchises that would sell GEIFC's products in the Canadian market. Defendants Milks Developments, Inc. ("Milks"), RGH Holdings Co. ("Gilchrest"), Edward Ricciardi, and Ted Odd (collectively, the "subfranchisees"), are Canadian subfranchisees that contracted, under Sub–Franchise Agreements signed between August 28, 1998 and September 1, 1999, to open stores for the sale of GEIFC products. One other subfranchisee, Great Earth Vitamins, Inc. ("GEV"), is not a party to the case. It is owned by the same individuals who own Ontario, and it is currently a dormant company.

Six Great Earth stores—two run by GEV, and one by each of the other four subfranchisees—opened between 1997 and 1999. The relationship flourished for several years. In September 1999, GEV entered into a leasing agreement with Hudson Bay malls to open stores, with dozens of stores contemplated over time and four that were opened within several months. Although there were sporadic problems with deliveries during this period, particularly with shipments of product seized at the border between the United States and Canada for unspecified reasons, the parties continued the enterprise and seemed satisfied with the results. Great Earth vitamin and health supplements included such products as Super Multi Minerals, Super Hy–Vites, Whey Ahead, and Ultra Energy Vanilla and Chocolate.

Between May and July 2000, a number of events occurred which caused a deterioration in the contractual relationship. In June 2000, a GEIFC shipment was seized at the Canadian border, again for unspecified reasons, and as a result, GEIFC stopped all shipments to defendants until near the end of August, when it resumed shipments with a reduced menu of products. Between May and July 2000, GEV and several of the subfranchisees stopped performing some of their contractual duties, including providing GEIFC with monthly gross sales information, making payments for royalties and for products that they had received, and ordering Great Earth products. The sequences, reasons, and interrelationships underlying these various events are disputed by the parties and are not at issue in the instant motions; evidence regarding these questions will undoubtedly be presented at trial.

Under Canadian regulations, a number of products that are available over the counter in the United States can be sold in Canada only with a prescription. These products include vitamin K, boron, chromium picolinate, ephedrine, and yohimbe bark. Defendants allege that GEIFC assured them that those of its vitamins and supplements which contained these ingredients would be reformulated to comply with Canadian law, and that the labels on the reformulated products would indicate that they did not contain any of these ingredients. In October 2000, suspicious that GEIFC was relabeling the products without actually reformulating them, de-

fendants tested a number of GEIFC products. The tests revealed that the supposedly reformulated products contained the prohibited ingredients, even though the labels did not list them.

By September or October 2000, the Hudson Bay stores began to close, and several of the other subfranchisees stopped ordering products. GEIFC served notice of termination on Ontario on December 1, 2000, alleging numerous breaches, including failure to open stores in accordance with the contractual schedule, failure to remit fees and to make required financial disclosures, and failure to comply with applicable laws. On the same date, GEIFC notified the subfranchisees that it had terminated Ontario under the MFA, and that the duties of the subfranchisees under the Sub–Franchise Agreements were now duties owed directly to GEIFC. Ten days later, on December 11, 2000, GEIFC served notice of termination on the subfranchisees, alleging that they had failed to pay required fees to GEIFC and that their employees were not properly trained in accordance with the Sub–Franchise Agreements; GEIFC also asserted a number of other breaches that would become grounds for termination if they were not immediately cured. GEIFC filed a lawsuit against the subfranchisees on January 8, 2001, and against Ontario on August 5, 2002.[1]

### II. The Contracts

The MFA established a franchise system for the operation of retail stores to sell Great Earth products. It defined GEIFC as the Franchisor and Ontario as the Master Franchisee, responsible for establishing and maintaining such stores. The initial franchise lasted ten years, with Ontario holding two successive five-year renewal options.

Article V of the MFA established a requirements contract for GEIFC to sell product to Ontario, and for Ontario to distribute it. Ontario was to buy all of its product from GEIFC, and, rather than have Great Earth product sold in supermarkets, pharmacies, or other more generalized stores, the product was to be sold only in Great Earth stores, specifically dedicated to selling Great Earth products. However, section 5.03(a) provided that GEIFC did not guarantee supply of product, and under section 5.09, GEIFC disclaimed liability for unavailability or delay in shipment or receipt of product for a list of reasons beyond its reasonable control.

Ontario and the subfranchisees assumed a number of other contractual duties. They were required to advertise, with such advertising to be overseen by GEIFC. They were required to share with GEIFC their financial data, including monthly gross receipts. Under section 5.03(b), they were required to purchase all other store supplies and merchandise from GEIFC or its designated sources. They were also required to make a number of payments, including royalty fees and payments for goods received.

Article XI contained several provisions governing lawsuits arising from the contract. Under section 11.02(a), all lawsuits were to be brought in the United States District Court for the Eastern District of New York. (These cases were brought in the Southern District of New York on consent.) Section 11.02(b) provided that "[t]he parties agree that all disputes ... shall be tried by the Court sitting without a jury, notwithstanding any state or federal constitutional or statutory rights or provisions." Section 11.02(c) barred punitive or exemplary damages, and section 11.04

---

1. The claims and counterclaims are substantively identical; the lawyers are the same; and the parties contemplate trying the two suits as one.

limited the potential liability of GEIFC. Section 11.04(c) provided:

> Nothing in this Agreement shall obligate Franchisor in respect of any claim by Master Franchisee or any third party (including, without limitation, ... any claim for lost profit or for consequential damages) arising out of the use of any know-how, technical information or processes or the sale or use of any products to which this Agreement relates....

Finally, section 11.14 provided that New York law was to govern the contract.

The parties also signed, on the same day, an Additional Agreement, which further specified various royalty payments, fees for opening stores, and a schedule of stores to be opened. It also defined the territory covered by the MFA as the province of Ontario, Canada, and the first right of refusal for the city of Winnipeg. Finally, the parties also entered into an Addendum Agreement on January 15, 1998, revising the schedule of stores to be opened and the accompanying payments.

Milks, Gilchrest, Ricciardi, and Odd each signed essentially identical Sub–Franchise Agreements. These contracts covered much of the same ground as the MFA, including the initial ten-year terms with five-year renewal options, use of trademarks, advertising, and the requirement that supplies and product be purchased from GEIFC through Ontario. They also defined additional rights and responsibilities in areas including training of employees and the selection and construction of store sites. In section 15.3, the Sub–Franchise Agreements selected New York law to control all contractual disputes, and in section 15.7(a), they selected the United States District Court for the Southern District of New York as the proper venue for all non-arbitrable disputes. Section 15.7(b), like its counterpart in the MFA, stated that "[t]he parties agree that all disputes admitted to the Court pursuant to

section 15.2 shall be tried to the Court sitting without a jury, notwithstanding any state or federal constitutional or statutory rights or provisions."

### III. Claims

GEIFC sued Ontario and the subfranchisees, asserting the following eight causes of action: (1) declaratory judgment of defendants' breach of contract; (2) breach of contract; (3) an accounting; (4) trademark infringement; (5) unfair competition through trademark misappropriation; (6) permanent injunction, enjoining defendants from using the Great Earth name and trademarks; (7) tortious interference with business relationships; and (8) loss of business reputation and destruction of goodwill.

Defendants' defenses and counterclaims include: (1) breach of contract; (2) fraud; (3) violation of the New York Franchise Act; (4) tortious interference with contractual relations; and (5) breach of warranty. In their fraud defense and counterclaim, defendants allege that GEIFC fraudulently mislabeled the franchised products. Defendants allege that they relied on the labels, and that once they discovered that the labels were false, they could no longer order the products that were fraudulently labeled. Moreover, defendants argue that they could no longer trust in the reliability of GEIFC products, making the franchises essentially valueless. On this defense and counterclaim, defendants claim they were damaged to the extent of their unrecouped investments and the cost of unsaleable merchandise. On their other claims, defendants alleged damage to the extent of their unrecouped expenses, including royalties and fees paid, and the lost profits they claim to have been able to make.

### IV. Legal Standards

#### A. Motions for Summary Judgment

A court may enter summary judgment if the "pleadings, depositions, answers to in-

terrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A "genuine issue" of "material fact" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When parties have filed cross-motions for summary judgment, "each party has an initial burden of informing the court of the basis for its motion and of identifying those parts of the record which it believes demonstrate the absence of a genuine issue of material fact." *Vogel v. W.A. Sandri, Inc.*, 898 F.Supp. 254, 255 (D.Vt. 1995). Although all facts and inferences therefrom are to be construed in the light most favorable to the party opposing the motion, *see Harlen Associates v. Village of Mineola*, 273 F.3d 494, 498 (2d Cir.2001), the nonmoving party must raise more than just "metaphysical doubt as to the material facts," *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[M]ere speculation and conjecture is insufficient to preclude the granting of the motion." *Harlen*, 273 F.3d at 499. "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted).

### B. Motions In Limine

"The purpose of a motion in limine is to allow the trial court to rule in advance of trial on the admissibility and relevance of certain forecasted evidence." *United States v. Paredes*, 176 F.Supp.2d 192, 193 (S.D.N.Y.2001). The Supreme Court has explained that "[a]lthough the Federal Rules of Evidence do not explicitly authorize in limine rulings, the practice has developed pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n. 4, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984); *see also Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir.1996) (approving the practice). In ruling on a motion in limine, a court may exclude evidence which is "clearly inadmissible on all potential grounds." *Paredes*, 176 F.Supp.2d at 193. Because of its posture, an in limine ruling may be reviewed at trial, and "the district judge is free, in the exercise of sound judicial discretion, to alter a previous in limine ruling." *Luce*, 469 U.S. at 41–42, 105 S.Ct. 460. While "dismissing claims is not the prototypical purpose of a motion in limine," such motions have sometimes been addressed on the merits and have sometimes "been construed as or converted into motions to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure or motions for summary judgment under Rule 56." *Fournier v. McCann Erickson*, 242 F.Supp.2d 318, 334–335 (S.D.N.Y.2003) (collecting cases).

### V. Plaintiff's First Motion

Defendants' Second Counterclaim is for fraud. *See* Answer and Amended Counterclaims of Defendant Ontario, Jan. 27, 2003 ("Ontario Counterclaims") ¶¶ 141–187; Answer and Amended Counterclaims of Defendants Milks, Gilchrest, Ricciardi, and Odd, Jan. 27, 2003 ("Subfranchisees Counterclaims") ¶¶ 138–179. GEIFC's first motion asks for two forms of relief: (1) dismissal of defendants' fraud counterclaim, on the grounds that neither the pleadings nor the facts state a separate claim for fraud; and (2) preclusion of defendants from introducing evidence relevant to fraud or to their fraud counterclaim that would not be admissible with respect to the breach of contract claim. Defendants oppose the motion and ask for sanctions against plaintiff "for bringing the same motion this Court has already ruled upon."

This is essentially the third time that plaintiff has moved against defendants' fraud defense and counterclaim. Plaintiff first moved in November 2002, and I heard oral argument on January 8, 2003. I ruled that the fraud defense and counterclaim had not been pled with sufficient specificity, and I dismissed that defense and counterclaim with leave to replead. After defendants repled, plaintiff renewed its motion for summary judgment, claiming that the amended fraud defense and counterclaim had still not been pled with specificity and, further, was indistinguishable from defendants' breach of contract counterclaim. I heard oral argument on June 11, 2003, and denied summary judgment without prejudice to renew in a fuller context before trial. (June 11, 2003 Transcript, 18–21.) With trial now approaching, the substantial discovery having been completed and evaluated, and in the context of final pre-trial preparations, plaintiff again renews its motion. I now rule that defendants' claim for fraud is substantially broader than the law can sustain, and I limit defendants' claims accordingly. Additionally, defendants are required to make an offer of proof as to the fraud-based damages they allegedly sustained.

The basics of New York's law of fraud are laid out in *Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.*, 98 F.3d 13 (2d Cir.1996). Under New York law, a fraud claim contains four elements: (1) a material false representation; (2) intent to defraud; (3) reasonable reliance upon the misrepresentation; and (4) resulting damages. *Id.* at 19; *see also Lama Holding Co. v. Smith Barney, Inc.*, 88 N.Y.2d 413, 646 N.Y.S.2d 76, 668 N.E.2d 1370, 1373 (1996) (same). New York law also requires that a fraud claim, raised in a case that stems from breach of contract, be "sufficiently distinct from the breach of contract claim." *Bridgestone/Firestone*, 98 F.3d at 20 (quoting *Papa's–June Music, Inc. v. McLean*, 921

F.Supp. 1154, 1162 (S.D.N.Y.1996)). Even an allegation of an intentionally false statement that meets all the elements of a proper fraud claim cannot support a cause of action "where a fraud claim 'is premised upon an alleged breach of contractual duties and the supporting allegations do not concern representations which are collateral or extraneous to the terms of the parties' agreement.'" *Id.* (quoting *Metropolitan Transportation Authority v. Triumph Advertising Productions*, 116 A.D.2d 526, 497 N.Y.S.2d 673, 675 (1st Dep't 1986)). It is this last requirement that plaintiff claims defendants have not met; defendants argue that the representations that defendants claim were false and misleading are not collateral or extraneous to the MFA.

*Bridgestone/Firestone* lays out three methods by which a party can successfully distinguish its fraud claim from its breach of contract claim. First, a party may demonstrate that its adversary had a legal duty towards it that was separate from its duty to perform under the contract, and that the fraud it committed was a breach of that separate legal duty. *Id.* at 21. Second, a party may "demonstrate a fraudulent misrepresentation collateral or extraneous to the contract." *Id.* Third, a party may show that it is entitled to "special damages that are caused by the misrepresentation and [are] unrecoverable as contract damages." *Id.*

A fraud claim asserted through the first of those three categories can potentially be premised on the doctrine established in *Sommer v. Federal Signal Corp.*, 79 N.Y.2d 540, 583 N.Y.S.2d 957, 593 N.E.2d 1365 (1992). In *Sommer*, a fire alarm operating company negligently deactivated its alarm system minutes before a fire began, and consequently could not hear the persistent signals that emanated from a burning building. The court held that

while an independent, non-contractual legal duty was required to sustain a tort claim, such a duty could be imposed by law even in some cases where the relationship between the parties was provided by contract. The New York Court of Appeals imposed a tort duty on the defendant, because the nature of the defendant's services was "affected with a significant public interest," and because the injury arose from a catastrophic fire which defendant should have prevented—"both typical of tort claims." *Id.* at 1370.

New York courts after *Sommer* have suggested that *Sommer* should be limited to cases involving threats to the public health or safety, rather than where a party is essentially suing to enforce a contract. In *New York University v. Continental Insurance Co.*, 87 N.Y.2d 308, 639 N.Y.S.2d 283, 662 N.E.2d 763 (1995), the Court of Appeals, distinguishing *Sommer*, held that an insurance company which disclaimed coverage under a commercial insurance policy could be liable for breach of contract, but not fraud. The Court of Appeals ruled that "[a]s compared to the fire-safety regulations cited in *Sommer*, the provisions of the Insurance Law are properly viewed as measures regulating the insurer's performance of its contractual obligations, as an adjunct to the contract, not as a legislative imposition of a separate duty of reasonable care." *Id.* at 768. Following *New York University*, the Appellate Division in *Logan v. Empire Blue Cross and Blue Shield*, 275 A.D.2d 187, 714 N.Y.S.2d 119 (2d Dep't 2000), held that, where insureds sued their insurance company for not covering the full extent of their expenses, "appellants are 'essentially seeking enforcement of the bargain,'" and that "'where a party is merely seeking to enforce its bargain, a tort claim will not lie.'" *Id.* at 124 (quoting *Sommer*, 583 N.Y.S.2d 957, 593 N.E.2d at 1369; *New York University*, 639 N.Y.S.2d 283, 662 N.E.2d at 768).

■ In this case, the separate legal duties which defendants assert that Great Earth breached were its duty under Canadian regulations to exclude certain ingredients from its vitamins and its duty to label its products truthfully. These duties satisfy the first category in *Bridgestone/Firestone*. Laws regulating the import and sale of drug and vitamin ingredients are enacted not primarily "as measures regulating [the actor's] performance of its contractual obligations," *New York University*, 639 N.Y.S.2d 283, 662 N.E.2d at 768, but essentially for the purpose of protecting the public health and safety and consumer choice. Including ingredients in vitamins without acknowledging them on the label may result in significant health risks to consumers, as might including ingredients which are prohibited by applicable regulations. Regulations prohibiting such actions are thus intended "as a legislative imposition of a separate duty of reasonable care," *id.*, and are "affected with a significant public interest," *Sommer*, 583 N.Y.S.2d 957, 593 N.E.2d at 1370. As defendants observe, even if there had been no contract in place, plaintiffs (or anyone else) would have been prohibited from selling vitamins with illegal ingredients in Canada, and certainly from doing so under fraudulent pretenses. Where a party selling pharmaceuticals intentionally includes illegal ingredients in its products and mislabels them to hide its deeds, violation of relevant regulations constitutes the breach of "a legal duty separate from the duty to perform under the contract," *Bridgestone/Firestone* 98 F.3d at 20, even if the obligation is also reflected in a provision of a contract, and accordingly may support a cause of action in tort.

While the focus in the first *Bridgestone/Firestone* inquiry is on the nature of the legal duty, the focus under the second *Bridgestone/Firestone* exception is on the nature of the fraud itself. The issue in the

second exception is whether the alleged fraudulent representations should be considered "collateral or extraneous to the contract," 98 F.3d at 21, and as a matter of both logic and law, the primary consideration here is whether the contract itself speaks to the issue. In *DynCorp v. GTE Corp.*, 215 F.Supp.2d 308 (S.D.N.Y.2002), GTE had sold its subsidiary, GTE Information Systems LLC, to DynCorp. After the closing, DynCorp discovered that GTE Information was not worth the value it had paid, particularly because a key asset, a contract to provide telephone service to inmates of the United States Bureau of Prisons, was unprofitable and experiencing serious problems. DynCorp sued for breach of contract and fraud. In the Purchase Agreement, however, GTE had repeatedly made a number of warranties, and DynCorp was suing for fraudulent misrepresentation on the same facts that GTE had warranted. I held, in deciding that case, that because these facts were specifically covered by the contractual warranties, and because of specific remedies provided by the contract for specific breaches of warranties and covenants, the alleged breaches could not be considered collateral or extraneous to the contract, and DynCorp could not satisfy this criterion of *Bridgestone/Firestone.* 215 F.Supp.2d at 326.

*Astroworks, Inc. v. Astroexhibit, Inc.*, 257 F.Supp.2d 609 (S.D.N.Y.2003), also acknowledged the terms of the contract as the touchstone of whether a fraudulent misrepresentation was collateral or extraneous to it. *See id.* at 616 n. 11 ("Whether a promise is collateral or extraneous to an agreement depends entirely on the contours of the agreement."). Plaintiffs and Greg Zsidisin, the principal of the defendant, had attempted to collaborate on a website for outer space enthusiasts, but as the relationship began to deteriorate, Zsidisin walked away from it and formed his own, competitive website. The collabora-

tion had allegedly included a promised forty percent ownership interest in the venture for Zsidisin. On Astroexhibit's and Zsidisin's motion to dismiss plaintiff's fraud claims, Judge Scheindlin found that because the forty percent ownership interest was an essential term of the agreement, it could not form the basis of a claim of fraud. However, she held that other alleged misrepresentations, which were not recited in the contract, could be collateral or extraneous to it, and could survive a challenge under *Bridgestone/Firestone.* 257 F.Supp.2d at 616–17.

*VTech Holdings Ltd. v. Lucent Technologies Inc.*, 172 F.Supp.2d 435 (S.D.N.Y. 2001), like *DynCorp*, involved representations inducing the sale of a telephone business—in *VTech Holdings*, the consumer telephone business of Lucent Technologies. Lucent moved to dismiss the fraud claim as indistinguishable from the breach of contract action. Judge Koeltl, interpreting the contract there in issue, distinguished between "misrepresentations of [the] future intention" of the defrauding party to perform under the contract, and "misrepresentations of present fact," which may have induced the injured party to perform under the contract. *Id.* at 439. Relying on *Jo Ann Homes at Bellmore, Inc. v. Dworetz*, 25 N.Y.2d 112, 302 N.Y.S.2d 799, 250 N.E.2d 214 (1969), Judge Koeltl explained that an intention not to perform under a contract is no different from the commonly presumed intention either to perform or to pay damages for breach of contract, and should be penalized no more extensively. By contrast, a misrepresentation of present fact, even one included in a warranty, might give rise to a claim of fraudulent inducement. Hence, *VTech Holdings* held that "the rule barring duplicative fraud claims applies only to claims based on alleged

misrepresentations of future intention." 172 F.Supp.2d at 439–40.

The Second Circuit also allowed a fraudulent misrepresentation claim in *Cohen v. Koenig*, 25 F.3d 1168 (2d Cir.1994). In *Cohen*, the buyers of a business's assets sued the sellers for alleged fraudulent misrepresentations which, they claimed, induced them into making the purchase. The Second Circuit did not state whether there were any relevant warranties, disclaimers, or obligations specified in the contract itself. It simply held that "a valid fraud claim may be premised on misrepresentations that were made before the formation of the contract and that induced the plaintiff to enter the contract." *Id.* at 1173.

In each of these cases, the basic rule is that a tort claim cannot be a reiteration of a breach of contract claim. *See, e.g., id.* ("a plaintiff is not allowed to 'dress up' a breach-of-contract claim as a fraud claim"); *Cranston Print Works Co. v. Brockmann International A.G.*, 521 F.Supp. 609, 614 (S.D.N.Y.1981) (where the alleged deception was the intention, from the outset, of the buyer of fabric not to pay for the goods, even though "New York law recognizes a cause of action for fraud in the inducement of a contract, this claim cannot be based solely upon the failure to perform the promises of future acts which constitute the contractual obligations themselves"). In looking at the second *Bridgestone/Firestone* criterion, I must examine whether the alleged misrepresentation was warrantied or not mentioned by the contract; whether it was the misstatement of a present fact which induced entry into the contract; whether it constituted the failure to perform a duty specified in the contract; and whether it is generally duplicative of the breach of contract claim. As noted above, the text of the contract is the first place to look.

In this case, the alleged fraudulent misrepresentation is the false labeling of products in order not to mention ingredients that may not be sold without a prescription under Canadian law. Labeling, however, was clearly plaintiff's duty under the contract. Sections 5.01 and 5.02 of the MFA made clear that Great Earth was responsible for selling products—vitamins, pills, and related merchandise—to Ontario, the Master Franchisee. Section 5.02, which structured the deal as a requirements contract, provided that "[a]ll Great Earth products shall be purchased by Master Franchisee and subfranchisees from Franchisor," and implied a corresponding commitment by the franchisor, Great Earth, to sell these products.

More to the point, section 5.03(b) provided that labels of GEIFC products must conform to a standard set by GEIFC, presumably a measure intended to insure accuracy and uniformity of labeling. The provision required that "[a]ll labels ... that have not been obtained from Franchisor or from Franchisor's designated sources shall conform to specifications and quality standards established by Franchisor ... and must be approved in writing by Franchisor." Defendants argue that this clause demonstrates that labeling was not an obligation of the plaintiff. To the contrary, the fact that labels had to be approved by Great Earth in writing demonstrates the necessary implication that Great Earth was responsible for the labels of its franchised products, whether purchased from GEIFC or from other suppliers. Further, this clause was intended as a fallback in case the previous sentence of section 5.03(b) was not satisfied: "All Other Products, supplies and materials required for the operation of the Master Franchised Business [or a] Franchised Business"—such items clearly including labels—"shall be purchased by Master Franchisee and its Subfranchisees only from suppliers approved in writing by Franchisor." While plaintiff could have outsourced this obligation, the contract clearly

gave GEIFC control over the product labels. Course of dealing evidence further supports this notion; plaintiff did, in fact, consistently supply labels for its products, a fact which buttresses the notion that plaintiff had the obligation to label its products.

It is worth noting that the alleged fraud here did not involve misrepresentations of a "present fact." *VTech Holdings*, 172 F.Supp.2d at 439. Even though the mislabeling constituted a misrepresentation of the actual composition of the vitamins, the "present fact" exception draws its vigor not from the nature of the misrepresentation in a vacuum, but from the fact that such a misrepresentation wrongfully induced the other party to enter into the contract. The mislabeling here occurred after the parties entered into the contract, and so, unlike in *DynCorp, VTech Holdings,* and *Cohen,* it could not possibly have induced the defendants to enter into the agreement. Defendants argue that the misrepresentation induced them to maintain their performance under the contract. But the breaches of contract which led to the MFA's termination occurred before the mislabeling was discovered, making defendants' current assertion, at best, speculative. Notice to GEIFC to cure the mislabeling would have stopped the practice or at least laid the basis for a proper termination.

Defendants rely on *Tomkins PLC v. Bangor Punta Consolidated Corp.,* 194 A.D.2d 493, 599 N.Y.S.2d 563 (1st Dep't 1993), which held that "[t]hough it is well settled that a cause of action for fraud may not be maintained when the only fraud charged relates to a breach of contract, the complaint specifically alleges that the defendants materially misrepresented a specific product." *Id.* at 564. Defendants suggest that here, too, plaintiff materially misrepresented specific Great Earth products. But the exception in *Tomkins* is not

sufficiently described for me to rely on it. The one-page opinion states no facts which might explain why the court ruled as it did, and why the case before me might be similar.

Defendants have thus satisfied the first *Bridgestone/Firestone* exception, but have failed to satisfy the second. The third exception, however, is the most crucial. In order to satisfy this third exception, defendants must show "special damages that are caused by the misrepresentation and unrecoverable as contract damages." *Bridgestone/Firestone*, 98 F.3d at 20.

I explained *Bridgestone/Firestone's* concept of "special damages" in *DynCorp:*

> Special damages, in the context of commercial fraud, arise in consequence of a breach and seek to compensate a plaintiff for losses other than the diminished value of the promised performance. *Bibeault v. Advanced Health Corp.,* No. 97 Civ. 6026, 2002 WL 24305, *2, 2002 U.S. Dist. Lexis 225, *6 (S.D.N.Y. Jan. 8, 2002) (citing New York cases). The circumstances giving rise to such damages must reasonably be anticipated at the time the contract was made. *Id.* In *Deerfield Communications Corp. v. Chesebrough–Ponds, Inc.,* 68 N.Y.2d 954, 510 N.Y.S.2d 88, 502 N.E.2d 1003 (1986), the seller was forbidden to sell certain aerosol products because of federal regulations, and was interested to sell the products to a company that represented it would sell the products in overseas markets other than those specifically proscribed. The representation did not became a covenant of the contract, and the buyer disregarded its representation that it would not sell the products in the proscribed areas. The New York Court of Appeals held that a fraud action could be maintained, ruling that the representation was neither "collateral" nor "duplicative" of the contract, and that the

seller was seeking, not the diminished value of the contract, but special damages arising from its need to locate, repurchase and destroy the offending merchandise. *Id.* at 956, 510 N.Y.S.2d 88, 502 N.E.2d 1003. *Cf. VTech Holdings Ltd. v. Lucent Tech. Inc.,* 172 F.Supp.2d 435, 440–41 (S.D.N.Y.2001) (damages flowing from wilfulness of breach allowed to exceed contract limitations where contract provision so allows).

215 F.Supp.2d at 326–327; *see also Marriott International, Inc. v. Downtown Athletic Club of New York City, Inc.,* No. 02 Civ. 3906, 2003 WL 21314056, at *6–7, 2003 U.S. Dist. Lexis 9570, at *19–*20 (S.D.N.Y. June 9, 2003) (Mukasey, C.J.) (following *DynCorp*).

The case at bar, unlike *DynCorp,* is striking in its similarity to *Deerfield.* Here, as in *Deerfield,* the parties entered into a contract whereby one party would sell a product to the other for distribution. Here, as there, regulations made selling the product illegal in one market, and the parties mutually agreed upon a distribution method which would avoid violating the regulations. Here, as there, the party which was responsible for complying with the regulations allegedly did not do so, and the other party, after seeking and not receiving assurances, asserted a claim for fraud alongside its claim for breach of contract. In *Deerfield,* the Court of Appeals upheld a separate award of damages for each of these two causes of action. Since *Bridgestone/Firestone* explicitly relies on *Deerfield* in its discussion of special damages, *see* 98 F.3d at 20, this case should as well.

■ The instant question is whether the damage defendants claim to have suffered from the mislabeling is a special consequence of the fraud and can be separated from the damages they can claim because of the alleged breach of contract. *Deer-*

*field,* 510 N.Y.S.2d 88, 502 N.E.2d at 1004. Defendants' damages must have been "caused by the misrepresentation and unrecoverable as contract damages." *Bridgestone/Firestone,* 98 F.3d at 20. The injury must not only exist, it must flow directly and proximately from the fraud, rather than from the breach of contract. *Id.; see also id.* at 19 (requiring "damage" as the final element of a fraud claim); *Lama Holding Co.,* 646 N.Y.S.2d 76, 668 N.E.2d at 1373 (requiring "injury"). Satisfying this requirement will be difficult for defendants because, as plaintiff correctly observes, there is a significant identity between the damages defendants claim under the breach of contract theory and the damages they claim under the fraud theory. *See* Ontario Counterclaims ¶¶ 135, 139–40, 173, 187; Subfranchisees Counterclaims ¶¶ 135, 137, 165, 179.

Defendants' fraud counterclaims assert two categories of damage. First, defendants claim that "[a]s a result of GEIFC's fraudulent labeling, Ontario lost the investment it made in the Great Earth franchise, which it would not have made had it known of GEIFC's fraud, and has suffered unrecouped investment." Second, defendants also claim the "cost of unsaleable merchandise." Ontario Counterclaims ¶ 187; *see also* Subfranchisees Counterclaims ¶ 179 (same). The total of these claimed damages is allegedly $600,000 for Ontario and $750,000 for the subfranchisees.

Defendants' first category of alleged damages is either entirely or almost entirely unrecoverable under their fraud cause of action, because the same damages are claimed as resulting from plaintiff's breach of contract. The agreements among the parties contemplated that Ontario and the subfranchisees were to invest money into their enterprises in reliance on the MFA and Great Earth's adherence to

it.[2] The costs which defendants allege were unrecouped were precisely the investments they made in accordance with their contractual obligations. As such, if these sunk costs were expended in consideration of a contract which plaintiff then breached, they are potentially recoverable in consequence of plaintiff's alleged breach of contract, and, accordingly, not under fraud. In order to sustain their claim, defendants must make an offer of proof demonstrating that the costs they seek to recover are unrecoverable as contract damages, and were caused by plaintiff's misrepresentations that are said to have been fraudulent.

The chronology of this case suggests that this will be a difficult showing for defendants to make. The alleged breaches of contract which caused the parties to stop performing under the contract occurred between May and July 2000, but the alleged fraud was not discovered until October 2000. Because the alleged breaches of contract occurred before the fraud was discovered, defendants cannot possibly argue that the fraud precipitated termination of the contract. Thus, damage resulting from the termination of the contract—which, it appears, includes all the unrecouped costs which defendants allege—cannot flow from the fraud. *See Pacs Industries, Inc. v. Cutler–Hammer, Inc.*, 103 F.Supp.2d 570, 572 (E.D.N.Y. 2000) (reliance upon the misrepresentation is an essential element of maintaining a fraud claim distinct from a breach of contract claim). Defendants must show damages resulting from the fraud distinct from the damage recoverable for breach of contract. As I noted above, defendants' claim that the fraud induced them to maintain their performance under the contract is unsupported by the evidence in the record, and accordingly, I do not credit defendants' assertion that damages flowing from costs expended in reliance on the contract could, in fact, be fraud-based damages.

Defendants' second category of alleged fraud-based damage is the "cost of unsaleable merchandise." Defendants assert that, upon discovery of the fraudulent labeling, they could no longer sell the products they had in stock and had to destroy those products at a loss. *See* Ontario Counterclaims ¶ 185; Subfranchisees Counterclaims ¶ 177. This type of damage is similar to that awarded in *Deerfield,* where the court permitted damages "for the costs to locate the goods, the costs to repurchase the goods, storage fees and disposal costs" for goods which could not be sold because they violated regulations. 510 N.Y.S.2d 88, 502 N.E.2d at 1005. These were specific goods which were directly affected by the tort, and the damage to these goods was "caused by the misrepresentation and unrecoverable as contract damages." *Bridgestone/Firestone,* 98 F.3d at 20.

The record supporting this category of damages is sparse, however, and while plaintiff has not challenged the strength of the record on this point, it is unclear

---

2. *See, e.g.,* MFA §§ 5.01 (Ontario to purchase product from GEIFC); 5.03 (supplies and materials); 5.05 (best efforts to increase demand for product); 6.02 (promotion of sales and expanding the market); 6.05 (advertising); 6.10 (payment of bills to third parties); 7.07 (payments to GEIFC); Additional Agreement §§ 4 (fees to open stores); 5 (royalties); Sub–Franchise Agreements §§ 3.2 (construction of stores); 4.1 (fixtures and equipment); 4.2 (signs); 4.5 (opening inventory); 4.6 (product); 4.7 (supplies and materials); 5.1 (fees); 5.3 (opening fee); 5.4 (continuing fee); 5.6 (other expenses); 6.4 (advertising by GEIFC); 6.5 (local advertising); 7.1 (training); 7.2 (additional training); 7.3 (on-site assistance); 10.4 (fees and taxes); 10.7 (maintenance, repair, and renovation); 10.10 (best efforts to increase demand); 11.1 (liability insurance); 11.2 (fire, theft, and extended coverage); 11.3 (business interruption coverage); 11.4 (other insurance); 17.7 (payments). The parties seem not to question that GEIFC and the subfranchisees came into privity.

whether defendants can bear their burden. Further, as noted above, it is possible, although unlikely, that defendants can show fraud-based damages stemming from the first alleged category, that of unrecouped costs. I will therefore require defendants to make an offer of proof before trial on the damages stemming from their fraud cause of action. Defendants must precisely identify special damages that they can prove resulted from the mislabeling, and they must present evidence showing the existence and extent of these damages.

In sum, because defendants' fraud defense and counterclaim meets the first exception set forth in *Bridgestone/Firestone,* their fraud claim would be permitted to survive alongside their claim for breach of contract. However, I will require defendants to make an offer of proof before trial as to their viable fraud-based damages. Accordingly, plaintiff's summary judgment motion is denied, and because the evidence underlying defendants' fraud claims may be relevant evidence under Fed.R.Evid. 401, I also at this time deny plaintiff's motion in limine. However, if no fraud-based damages can be proven, I will at that point grant plaintiff's summary judgment motion—and, consequently, its in limine motion—and bar defendants from bringing their fraud claim. Finally, plaintiff's motion was not frivolously brought, and I had explicitly allowed it on the record on June 11, 2003. I thus deny defendants the sanctions they request against plaintiff for bringing this motion.

### VI. Plaintiff's Second Motion

Defendants seek lost profits as part of their damages. *See* Ontario Counterclaims ¶¶ 140, 191, 194, 197 (First, Third, Fourth, and Fifth Counterclaims); Subfranchisees Counterclaims ¶¶ 137, 183, 186, 189, 192 (First, Third, Fourth, Fifth, and Sixth Counterclaims). GEIFC's second motion in limine is a motion to strike all evidence relating to the claims of lost profits. Unlike GEIFC's first motion, this motion does not double as a motion for summary judgment, and so only the legal standards governing motions in limine are applicable.

■ Under New York law, loss of future profits which would have been earned but for the breach of contract are recoverable, provided they satisfy three criteria. "First, it must be demonstrated with certainty that such damages have been caused by the breach and, second, the alleged loss must be capable of proof with reasonable certainty." *Kenford Co. v. County of Erie,* 67 N.Y.2d 257, 502 N.Y.S.2d 131, 493 N.E.2d 234, 235 (1986) (*Kenford I*). Third, "there must be a showing that the particular damages were fairly within the contemplation of the parties to the contract at the time it was made." *Id.* Plaintiff challenges defendants' lost profits counterclaims here based on the second and third of these requirements—that the extent of lost profits is speculative, and that damages for lost profits were not within the contemplation of the parties when they entered into the contract. Because I agree with plaintiff that defendants cannot satisfy the third *Kenford* criterion, I grant plaintiff's second motion in limine. I therefore need not address the second criterion, which would require evaluation of an offer of proof.

Most of the leading cases which have decided on claims of future lost profits have ruled that they are not recoverable. *See, e.g., Kenford I; Kenford Co. v. County of Erie,* 73 N.Y.2d 312, 540 N.Y.S.2d 1, 537 N.E.2d 176 (1989) (*Kenford II*); *Schonfeld v. Hilliard,* 218 F.3d 164 (2d Cir.2000); *Trademark Research Corp. v. Maxwell Online, Inc.,* 995 F.2d 326 (2d Cir.1993). *Kenford* itself involved a contract between the Kenford Company and Erie County to build a domed stadium for the Buffalo

Bills. Ancillary to that contract was another agreement authorizing Kenford to manage the stadium for twenty years. In *Kenford I,* plaintiffs sued for the lost profits that they would have earned from the management contract. In *Kenford II,* Kenford sued for loss of profits stemming from the lost appreciation of real estate located in the stadium's vicinity. Both times, the Court of Appeals denied the claims for lost profits, holding in part that the evidence did not demonstrate that the parties had contemplated such claims at the time they signed the contract. *Kenford I,* 502 N.Y.S.2d 131, 493 N.E.2d at 236; *Kenford II,* 540 N.Y.S.2d 1, 537 N.E.2d at 176, 179.

■ In making its determination, *Kenford I* charted a course for courts to follow in determining whether the parties had contemplated recovery for lost profits. First, *Kenford I* looked at the contract itself to see if any provision discussed such a remedy. Second, if the contract remained silent, "the commonsense rule to apply is to consider what the parties would have concluded had they considered the subject." 502 N.Y.S.2d 131, 493 N.E.2d at 236. *Kenford II* followed this course, noting that the commonsense approach includes consideration of "the nature, purpose and particular circumstances of the contract known by the parties ... as well as 'what liability the defendant fairly may be supposed to have assumed consciously, or to have warranted the plaintiff reasonably to suppose that it assumed, when the contract was made.'" 540 N.Y.S.2d 1, 537 N.E.2d at 179 (quoting *Globe Refining Co. v. Landa Cotton Oil Co.,* 190 U.S. 540, 544, 23 S.Ct. 754, 47 L.Ed. 1171 (1903)). *Kenford* and other cases have also made clear that defendants, as the party seeking lost profits, have the burden of proof on this issue. *See Kenford I,* 502 N.Y.S.2d 131, 493 N.E.2d at 235 ("there must be a showing"); *Trademark Research,* 995 F.2d at 334 ("[plaintiff] had the burden of proof on this issue").

Following the procedure laid out in *Kenford I* and *Kenford II,* I look first to the contract as the best source of evidence for the intentions of the parties. Section 11.04 of the MFA, entitled "Warranty," reads as follows:

> Except as expressly provided herein, Franchisor makes no warranty of any kind express or implied concerning any matter covered by this Agreement.... Nothing in this Agreement shall obligate Franchisor in respect of any claim by Master Franchisee or any third party (including, without limitation, ... any claim for lost profit or for consequential damages) arising out of the use of any know-how, technical information or processes or the sale or use of any products to which this Agreement relates....

■ This clause is the only contractual provision—indeed, the only piece of documentary evidence in the record at all—that directly addresses the parties' contemplation of lost profits, and it clearly limits plaintiff's obligation to pay them. It states that nothing in the contract, and thus no breach of contract claim, obligates GEIFC to pay defendants (or anyone else) on any claim for lost profits arising out of the sale or use of any products covered by the MFA. Defendants argue that this clause covers only warranty claims, but this is a misreading; the plain language of the final sentence does not include any such limitation. They also argue that this clause is boilerplate, but when a contract has been carefully negotiated between two sophisticated parties with the assistance of counsel, such an argument is unavailing. *See, e.g., Frankel v. ICD Holdings S.A.,* 930 F.Supp. 54, 63 (S.D.N.Y.1996) (giving credence, as not boilerplate, to "the product of negotiations among sophisticated busi-

nessmen that produced custom-crafted instruments").

Defendants further argue that the clause, by its wording, does not cover this claim. They argue that the final phrase of this sentence in section 11.04, "arising out of ... the sale or use of any products to which this Agreement relates," limits the release to any lost profits arising out of sales to consumers by Ontario or any subfranchisee. They contend that if the parties intended to eliminate any liability whatsoever for lost profits, they could have simply written the sentence without the "arising out of" claim. Yet this reading of the contract assumes, with no basis, that a sale by GEIFC to Ontario or the subfranchisees is not a "sale" under section 11.04. This reading also forgets that the sentence was constructed with more complexity than simply a release of lost profits liability. The reference to lost profits is found in parentheses, coupled with other provisions. If the "arising out of" phrase were removed, the sentence (parenthetical aside) would simply state that "Nothing in this Agreement shall obligate Franchisor in respect of any claim by Master Franchisee or any third party." Such a release would have been far broader than the one that was actually included in the MFA.

Read broadly, section 11.04 bars all claims of lost profits from sales, including those of GEIFC to the defendants. Read narrowly, the clause does not bar those claims, and is instead silent on them. I must glean from the text the contemplation of the parties on the issue of lost profits. Read in such light, the clause clearly evidences an intention to limit plaintiff's liability for lost profits, and, equally important, it provides no evidence whatever that GEIFC contemplated that it should be held liable in any other respect with regard to the products covered by the Agreement.

This reading of section 11.04 is buttressed by two other clauses in the MFA. First, section 5.03(a) (Suppliers and Supplies) states that "Franchisor does not guarantee or otherwise assure that Master Franchisee will be able to obtain or purchase any or all products or other items." Second, section 5.09 (Unavailability or Delay) provides that "Franchisor shall in no event be liable to Master Franchisee or any of its Subfranchisees for unavailability of or delay in shipment or in receipt of merchandise due to ... governmental restrictions ... or other terms beyond the reasonable control of Franchisor." Neither of these clauses specifically deals with lost profits, and neither unqualifiedly speaks to our inquiry here. Section 5.03(a), while disclaiming any guarantee, is silent on liability. And section 5.09, while limiting liability, limits it for unavailability or delay "beyond the reasonable control of Franchisor," and it is defendants' position that plaintiff was, in fact, responsible for the unavailability or delay which breached the contract. Nonetheless, in reading these sections together as evidence of the parties' intentions, it is clear that they evince an intention to limit plaintiff's liability for undelivered goods, rather than to expand it. Accepting that as a general principle, the evidence from the MFA suggests that plaintiff did not accept upon itself this liability, particularly without any contractual clause or other documentary proof to the contrary.

At oral argument, defendants relied primarily on the assertion that because the parties entered into the contract with the anticipation of earning profits, they must have also anticipated that if the contract were breached, a claim for lost profits would be available. This argument goes too far. Every party entering into a commercial contract does so with the intention of earning profits, and if courts adopted defendants' logic, they would essentially

nullify the limitation, imposed by the Court of Appeals, that the parties must have specifically contemplated a claim for lost profits when they entered into the contract. The critical distinction which defendants fail to make is that the parties must contemplate, not turning a profit, but "the particular damages" owing to lost profits should the deal turn sour. *Kenford I,* 502 N.Y.S.2d 131, 493 N.E.2d at 235. While the defendants may have had an expectation of profits, they have not shown that they and plaintiffs considered appropriate, at the time they signed the contract, a suit for lost profits, and the categories of lost profits, should the contract be breached. Indeed, *Kenford II* specifically rejected the very argument defendants make now. 540 N.Y.S.2d 1, 537 N.E.2d at 180; *see also Trademark Research,* 995 F.2d at 334 (citing *Kenford II* ).

In their brief, defendants identify two other sections of the MFA as evidence that GEIFC should be liable for lost profits: sections 1.01 (Grant of Master Franchise) and 4.02 (Improvements to Franchise System). Defendants argue that these provisions establish the MFA as a requirements contract, and accordingly obligate plaintiff to provide product. They allege that plaintiff is similarly liable to the subfranchisees also, either contractually or through a claim of tortious interference. Either way, plaintiff's obligation to provide product may be assumed for these purposes, but that is irrelevant to the question at hand. Simply because plaintiff was required to provide product does not mean that plaintiff would be liable for defendants' lost franchise profits. Defendants argue that their requirements contract would become illusory without a right to recover lost profits, but there is no indication in the New York precedents, cited above, that requirements contracts should be removed from the general rule. The contract is not illusory; it simply declines to provide for expansive damages, and the fact that it obligates plaintiff to provide product does not require an interpretation that allows plaintiff to be sued for lost profits stemming from a breach.

The commonsense rule is the second step of the *Kenford* analysis, *see* 502 N.Y.S.2d 131, 493 N.E.2d at 236, and an analysis under that rule also favors plaintiff's position. A finding that the parties did not contemplate an award of lost profits may be based, under the commonsense rule, on examples from previous cases and, more importantly, on the absence of any evidence whatever to support the notion that the parties did, in fact, contemplate that lost profits would give rise to damages.

The facts of the two leading cases which held that lost profits were recoverable illustrate the high standard which defendants have not met. In *Ashland Management Inc. v. Janien,* 82 N.Y.2d 395, 604 N.Y.S.2d 912, 624 N.E.2d 1007 (1993), a management firm and its former employee had entered into a contract for the use of a mathematical model for determining investment strategy. In negotiating that contract, they had extensively bargained over a provision which allowed for the recovery of lost profits and set a precise schedule of the amount of recovery permitted. The employee's lost profits claim was thus fully within the contemplation of the parties. *Id.* at 1011. The facts in the second case, *Travellers International, A.G. v. Trans World Airlines, Inc.,* 41 F.3d 1570 (2d Cir.1994), are somewhat unique. Travellers arranged tours which would fly TWA, but as the Second Circuit noted, Travellers was essentially "a captive supplier of tours for TWA," as the latter "exercised control over the demand for [the] tours." *Id.* at 1578. Further, the parties had a twenty-year prior relationship, and they were presently operating under an injunction which required them

to continue performance of their contractual duties. Under such constrained situations, the Second Circuit held that the "contemplation of the parties" test was satisfied and that Travellers's damages could be enumerated with some certitude. *Id.*

Both of these cases satisfied the *Kenford* test with concrete evidence that a claim for lost profits was within the contemplation of the parties. In *Ashland,* the contract specifically provided for damages for lost profits. In *Travellers,* a twenty-year history shed light on the relationship, as did an injunction which legally bound the plaintiff to continue providing services to a sole consumer, despite the plaintiff's economic captivity to that consumer's ability to manipulate the market. The facts in our case do not approach either of those situations, and the evidence that the parties here contemplated lost profits is weak by comparison.

By contrast, the evidence in *Trademark Research* was comparable with that shown here. In that case, defendant had contracted to design and input a database and search system, for plaintiff's internal use and for its CD–ROM, which plaintiff would market. Defendant utterly failed to supply the database and search system, causing long delays, and, during the interim, lost profits. Nevertheless, the Second Circuit affirmed the finding that "the evidence was insufficient to support a finding that the parties contemplated liability for … lost profits damages." *Trademark Research,* 995 F.2d at 334. The evidence there was akin to the evidence here—bare assertions that the non-breaching party was relying on the breaching party's performance, and that the breaching party could believe therefore that its contractual partner would suffer severe damages if performance was not forthcoming.

In response to that assertion, the *Trademark Research* court noted that such an assertion could in fact give rise to an inference favoring defendant. Defendant argued that if, as plaintiff maintained, it had a "serious question" about defendant's ability to provide adequate product, and this ability to provide adequate product was of the utmost importance to plaintiff's survival, defendant would have thus had sufficient motivation to limit or at least clarify the extent of its liability under the contract. The Second Circuit adopted that argument specifically; especially in light of the lengthy contract period, the court accepted that defendant's "awareness that there was a large downside risk for [the plaintiff] militates against the idea that [the defendant] would have embraced it." *Id.*

This rationale is equally applicable to the case at bar. More importantly, there was no evidence that lost profits had been discussed by the parties in *Trademark Research,* and neither is there such evidence here. *Trademark Research* held that an award of lost profits should not be made, *id.,* and that should be the rule in this case as well.

I thus find that liability for lost profits was not "fairly within the contemplation of the parties to the contract at the time it was made." *Id.* Accordingly, I grant plaintiff's second motion in limine. Defendants will be barred from presenting at trial any evidence relating to their claims of lost profits.

### VII. Jury Trial

Both plaintiff's First Amended Complaint and defendants' Answers and Amended Counterclaims demand trial by jury. At oral argument on October 8, 2003, however, I called the parties' attention to section 11.02(b) of the MFA. That provision clearly waives any right to a jury trial, and mandates that "all disputes admitted to the Court in respect of this agreement shall be tried by the Court

sitting without a jury, notwithstanding any state or federal constitutional or statutory rights or provisions." The Sub–Franchise Agreements also waive trial by jury, in section 15.7(b). At oral argument, I asked the parties for submissions which would clarify their present positions regarding a jury trial.

In their submission, defendants withdrew their jury demand and moved to strike that of plaintiff; they requested that the case be tried by the Court. Plaintiff opposed that motion and maintained its stance that the case should be tried by a jury. Plaintiff cited to Fed.R.Civ.P. 39(a) in support of its position. That rule reads as follows:

> When trial by jury has been demanded as provided in Rule 38, the action shall be designated upon the docket as a jury action. The trial of all issues so demanded shall be by jury, unless (1) the parties or their attorneys of record, by written stipulation filed with the court or by an oral stipulation made in open court and entered in the record, consent to trial by the court sitting without a jury or (2) the court upon motion or of its own initiative finds that a right of trial by jury of some or all of those issues does not exist under the Constitution or statutes of the United States.

■ Unquestionably, the Seventh Amendment right to trial by jury may be waived, and the waiver is enforceable so long as it is made "knowingly and voluntarily." *Morgan Guaranty Trust Co. v. Crane,* 36 F.Supp.2d 602, 603 (S.D.N.Y. 1999); *see also National Equipment Rental, Ltd. v. Hendrix,* 565 F.2d 255, 258 (2d Cir.1977) ("knowingly and intentionally" and discussing voluntariness by inquiring into whether defendant had "any choice but to accept" the waiver). It is undisputed that section 11.02(b) of the MFA waived GEIFC's right to a jury trial, and that this waiver was entered into knowingly and voluntarily. It was, after all, GEIFC's counsel who drafted the MFA, and the MFA emphasizes this provision by recording it in entirely capital letters.

■ A contractual waiver of a jury trial is enforceable. *See, e.g., Herman Miller, Inc. v. Thom Rock Realty Co.,* 46 F.3d 183, 189 (2d Cir.1995); *Morgan,* 36 F. Supp 2d at 603 (calling jury trial waivers "regularly enforced"); *Brown v. Cushman & Wakefield, Inc.,* 235 F.Supp.2d 291, 293–94 (S.D.N.Y.2002). A close parallel to the present case is provided in *National Westminster Bank v. Ross,* 130 B.R. 656, 666–67 (S.D.N.Y.1991), *aff'd sub nom., Yaeger v. National Westminster,* 962 F.2d 1 (2d Cir.1992). Two sophisticated parties had signed a contract containing a jury waiver clause. When the case was brought, the defendant demanded a jury trial, arguing that his waiver should not be enforced. The plaintiff moved to strike the jury demand, and the court granted the motion. Judge Kram observed that "New York courts have consistently upheld jury trial waiver provisions. . . . In fact, the Court cannot find a single reported New York decision in which a court refused to enforce a jury trial waiver provision in a bank loan agreement or guarantee, and the parties alert the Court to none." *Id.* at 666–47. Notably, Judge Kram also held that the relative lateness of the motion to strike was no barrier to granting it. *Id.* at 667–68. The facts here are similar, and while the contract is a franchise agreement rather than a bank loan guarantee, plaintiff has similarly cited no cases that support its position. A party cannot unwaive that which it effectively waived.

Accordingly, in keeping with the policy expressed in the caselaw of favoring enforcement of jury waiver clauses, and to promote the orderly and efficient disposition of this case, I strike plaintiff's jury

demand under Fed.R.Civ.P. 39(a), and rule that the case will proceed as a bench trial.

*VIII. Conclusion*

For the reasons stated, I deny plaintiff's first motion. Defendants may maintain their fraud claim, but as severely restricted; additionally, I will require defendants to make an offer of proof before trial regarding the damages stemming from this cause of action. I grant plaintiff's second motion, barring defendants from presenting any evidence to support their claim of lost profits. I also grant defendants' motion to strike the demand for a jury trial.

The parties shall appear before me on March 22, 2004, at 4:00 p.m., for a final pre-trial conference, and for a hearing on defendant's offer of proof regarding the damages from its fraud claim.

SO ORDERED.